856 A.2d 643

**Joseph M. DELLA RATTA, et al.**

v.

**Barbara A. LARKIN, et al.**

**No. 126, Sept. Term, 2003.**

Court of Appeals of Maryland.

Aug. 20, 2004.

554

James E. Carbine (James E. Carbine, P.C., Baltimore, on brief), for appellants.

Timothy E. Meredith (Robert W. Warfield, Warfield, Meredith & Darrah, P.C., Saverna Park, on brief), for appellees.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

This dispute among the partners of the East Park Limited Partnership ("East Park") arose in the aftermath of East Park's sole general partner issuing a substantial capital call in March 2002. Some of the limited partners, who believed compliance with the capital call was financially unwise, wrote to the general partner to inform him of their intention to

withdraw from the partnership before the capital call became due. The general partner responded that the limited partners could not withdraw from the partnership and would be in default should they fail to comply with the capital call, the due date for which the general partner accelerated to a point in time prior to the announced effective date of the withdrawal of the pertinent limited partners.

The limited partners who wished to withdraw filed a complaint in the Circuit Court for Anne Arundel County seeking, among other things, a declaratory judgment that they had a statutory right to withdraw from East Park and an injunction barring enforcement of the capital call. The Circuit Court ultimately entered judgment in favor of the limited partners. This appeal followed in which we consider a number of issues of first impression concerning Maryland partnership law. Although we agree with the Circuit Court's (1) application to the facts of this case of Maryland's Uniform Partnership Act, instead of Maryland's Revised Uniform Partnership Act; (2) conclusion that the limited partners possessed a statutory right to withdraw; and (3) declaration that the general partner, in accelerating the capital call and failing to investigate alternative financing, breached his fiduciary duty and acted in bad faith, we disagree with its determination that an assignment of a partnership interest in violation of an anti-assignment clause is valid and enforceable and, in this instance, caused East Park's dissolution.

### I.

In 1969, the Trinity Joint Venture Limited Partnership ("Trinity") was formed in Maryland to develop commercially-zoned property on Crain Highway in Glen Burnie. In 1974, Trinity admitted Joseph M. Della Ratta ("Della Ratta") as a general partner.

On 21 December 1981, an amended partnership agreement (the "Agreement") was executed under which Della Ratta became Trinity's sole general partner. Della Ratta also was one of the partnership's thirteen limited partners. The

Agreement was amended on 4 May 1992 to change the name of the partnership to East Park. A further amendment was executed on 1 June 1992 substituting as limited partners the widows (Barbara A. Larkin, Rosemary Krupnik, and Valeree Sass) of three deceased limited partners.

East Park developed a shopping center on its Glen Burnie property that, over time, grew to include 205,000 square feet of retail space. In 1992, East Park obtained $9,000,000 in financing secured by a mortgage on the shopping center (the "Aegon Loan"). The Aegon Loan provided for interest at the rate of 9.375% per annum and had a due date of 1 January 2003.

In December 2001, Della Ratta, a legal resident of Florida, created the Della Ratta Intangible Asset Management Trust (the "Trust") in order to avoid a Florida tax on intangible assets. When Della Ratta's accountant prepared East Park's 2001 tax returns, he showed no ownership interest for Joseph M. Della Ratta. Instead, the K–1 Schedules reflected that all of Della Ratta's ownership interest in East Park had been transferred to the Trust. After the tax returns were brought to his attention during the course of the present litigation, Della Ratta argued that this purported transfer was a mistake and filed amended returns correcting the alleged mistake.

By letter dated 1 March 2002, Della Ratta informed East Park's limited partners that the Aegon Loan would be due on 3 February 2003.[1] The letter stated that the loan balance of $7,528,499 could not be repaid by East Park's cash reserves and that a capital call would be due on 30 September 2002. Each limited partner would be required to contribute his or her pro-rata share of the Aegon Loan balance.

Some of the limited partners met with Della Ratta on 15 March 2002 to discuss the capital call. According to the meeting minutes, some limited partners were concerned about meeting the capital call. Refinancing the Aegon Loan was

---

1. Although the Aegon Loan due date was 1 January 2003, Della Ratta referred to 3 February 2003 as the loan's due date.

suggested as an alternative. Della Ratta stated that he would contact lenders and try to get a commitment for a loan. By his own admission, Della Ratta thereafter failed to explore refinancing options.

After the 15 March meeting, Barbara Larkin, Valerie Sass, Rosemary Krupnick, and the Charles L. Helferstay Residuary Trust (the "Withdrawing Partners" or "Appellees") each gave written notice to Della Ratta purporting to exercise their statutory right to withdraw from East Park, pursuant to Md.Code (1975, 1999 Repl.Vol.), § 10–603(b) of the Corporations and Associations Article.[2,3] Each Withdrawing Partner's withdrawal would be effective on 29 September 2002, giving more than the six months notice required by § 10–603(b). The Withdrawing Partners' attorney subsequently wrote to Della Ratta to inform him that, pursuant to Md.Code (1975, 1999 Repl.Vol.), § 10–604 of the Corporations and Associations Article,[4] each Withdrawing Partner asserted entitlement to the fair value of her or its interest in East Park.

---

**2.** Unless otherwise indicated, all statutory references are to Maryland Code (1975, 1999 Repl.Vol.), Corporations and Associations Article.

**3.** Md.Code (1975, 1999 Repl.Vol.), § 10–603(b) of the Corporations and Associations Article provides:

*When not specified by agreement.*—A limited partner may withdraw on not less than 6 months' prior written notice to each general partner at the general partner's address on the books of the limited partnership if the following conditions are met:

(1) The limited partnership was formed before October 1, 1998;

(2) On October 1, 1998, the partnership agreement of the limited partnership did not specify in writing the time or the events on the occurrence of which a limited partner may withdraw or a definite time for the dissolution and the winding up of the limited partnership; and

(3) The limited partnership did not amend its partnership agreement on or after October 1, 1998 to specify in writing the time or the events on the occurrence of which a limited partner may withdraw or a definite time for the dissolution and winding up of the limited partnership.

**4.** Md.Code (1975, 1999 Repl.Vol.), § 10–604 of the Corporations and Associations Article provides:

Except as otherwise provided in this subtitle, on withdrawal any withdrawing partner is entitled to receive any distribution to which

Della Ratta wrote to the Withdrawing Partners' counsel on 3 April 2002 claiming that § 10–603(b) was inapplicable because the Agreement specified when the Withdrawing Partners' capital could be removed from the partnership and the Withdrawing Partners were not so entitled under the circumstances. After further communications, on 10 May 2002, Della Ratta again wrote to the Withdrawing Partners' counsel and extended a settlement offer good for ten days. He stated that if the settlement offer was not accepted, the capital call would be accelerated and due on 1 September 2002. Della Ratta claimed that a default by the Withdrawing Partners in meeting the call would result in forfeiture of their interests in East Park.[5]

The Withdrawing Partners collectively owned a 20.797% interest in East Park. In order to meet the capital call, the Withdrawing Partners were obligated to contribute a total of approximately $1,126,000.

In addition, in his correspondence Della Ratta suggested that the East Park partners might face additional capital calls in the future. Although as the sole general partner Della Ratta exclusively controlled any cash distributions from East Park to the partners, he gave no indication that he planned to make distributions in the future. Indeed, for a number of years the limited partners realized no net income from their investment in East Park. Given these circumstances, the Withdrawing

---

the partner is entitled under the partnership agreement and, if not otherwise provided in the partnership agreement, the partner is entitled to receive, within a reasonable time after withdrawal, the fair value of the partner's partnership interest in the limited partnership as of the date of withdrawal, based on the partner's right to share in distributions from the limited partnership.

5. Section 13 of the Agreement provides that if a limited partner fails to make "any installment of his capital contribution," his ownership interest can be purchased by the other partners at a price equal to "the amount of his capital contributions plus the amount paid to purchase outgoing partners less distributions, without interest ..." Because the partners had received, over the years, distributions that exceeded their contributions, limited partners who failed to satisfy the capital call essentially would forfeit their investments in East Park.

Partners believed that further out-of-pocket investment in East Park was unwise. For some limited partners, satisfying the capital call also would have been a serious financial hardship.

On 24 May 2002, the Withdrawing Partners filed a complaint in the Circuit Court for Anne Arundel County seeking a declaratory judgement that they properly had withdrawn from East Park and were entitled to the fair value of their East Park partnership interests. They also sought an injunction barring enforcement of the capital call. East Park, Della Ratta, other limited partners, and purported assignees of East Park interests (collectively, the "Remaining Partners" or "Appellants") were named as defendants.[6]

The Withdrawing Partners amended their complaint approximately two months later to add a count seeking a declaratory judgment that East Park was dissolved in December 2001 when Della Ratta purportedly transferred his interest to the Trust. On the same day, the Withdrawing Partners filed an amended motion for summary judgment on the issues of East Park's purported dissolution and the Withdrawing Partners' purported statutory right of withdrawal, together with a motion for a preliminary injunction to stay enforcement of the capital call claimed due on 1 September 2002.

The Circuit Court, by an order of 30 August 2002, granted partial summary judgment to the Withdrawing Partners, ruling that the Withdrawing Partners had a statutory right to withdraw from East Park. The Circuit Court also issued a preliminary injunction enjoining the capital call pending a trial on the merits.

A bench trial on liability was held from 22 January through 24 January 2003.[7] On 28 March 2003, the Circuit Court issued

---

**6.** The Withdrawing Partners' original complaint did not name as defendants all of the Appellants in this appeal. Several Appellants were added as defendants in the amended complaint.

**7.** The Circuit Court bifurcated the case into a liability phase and a damages phase.

an opinion and order (1) declaring that Della Ratta's assignment to the Trust effected his withdrawal as general partner and triggered East Park's dissolution; (2) ordering East Park to wind up its business and distribute its assets to the partners; and (3) permanently enjoining enforcement of the capital call against the Withdrawing Partners.

On 21 May 2003, the Circuit Court stayed, pending final judgment and appeal, all aspects of its 28 March order, other than the permanent injunction barring enforcement of the capital call. Because the Circuit Court's determination that East Park had been dissolved made moot its prior order that the Withdrawing Partners properly exercised a statutory right of withdrawal, there was no trial on the question of relief. On 28 July 2003, the Circuit Court issued its final judgment: (1) declaring that East Park was dissolved; (2) ordering East Park wound up and its assets distributed to its partners; and (3) continuing the permanent injunction barring enforcement of the capital call.

The Remaining Partners filed a timely appeal to the Court of Special Appeals. While the appeal was pending and before the intermediate appellate court could decide the case, the Withdrawing Partners filed a petition for writ of certiorari with this Court. On 11 February 2004, we issued the writ, *Della Ratta v. Larkin*, 379 Md. 225, 841 A.2d 339 (2004), to consider the following questions, which we have slightly rephrased:

I. Whether the Circuit Court erred in concluding that the Uniform Partnership Act, not the Revised Uniform Partnership Act, as enacted in Maryland, governs the outcome of this case?

II. Whether the Circuit Court erred in finding that Della Ratta transferred his general partner interest in East Park to a trust and thereby caused the dissolution of the limited partnership?

III. Whether the Circuit Court erred in finding that the Withdrawing Partners had a statutory right to withdraw from East Park pursuant to § 10–603(b)?

IV. Whether the Circuit Court properly enjoined enforcement of the capital call based on its findings that Della Ratta did not have the authority to unilaterally issue the capital call, and that Della Ratta breached his fiduciary duties as general partner when he issued, then advanced the due date of, the capital call?

## II.

 When reviewing a case tried without a jury, we review the case on both the law and the evidence. Md. Rule 8–131(c) (2004 Repl.Vol.). We will not set aside a Circuit Court's findings of fact unless clearly erroneous, and we must give due regard to the opportunity of the trial court to assess the credibility of the witnesses. *Id.* "In addition, we must consider the evidence in the light most favorable to the prevailing party . . . and decide not whether the trial judge's conclusions of fact were correct, but only whether they were supported by a preponderance of the evidence." *Colandrea v. Wilde Lake Community Ass'n, Inc.,* 361 Md. 371, 394, 761 A.2d 899, 911 (2000) (quoting *Urban Site Venture II Ltd. Partnership v. Levering Assocs. Ltd. Partnership,* 340 Md. 223, 229–230, 665 A.2d 1062, 1065 (1995)) (citations omitted). The clearly erroneous standard does not apply to our review of a trial court's legal conclusions, which we review *de novo.* *See Ins. Co. of N. Am. v. Miller,* 362 Md. 361, 372, 765 A.2d 587, 593 (2001).

 When reviewing a grant of a motion for summary judgment, our task is to determine whether any genuine dispute of material fact was shown to exist and, if not, whether the Circuit Court was legally correct. *See Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 737, 625 A.2d 1005, 1011 (1993). A trial judge's grant of injunctive relief, however, unless infected by an erroneous legal conclusion, is reviewed for abuse of discretion. *See Colandrea,* 361 Md. at 394, 761 A.2d at 911.

## III.

Maryland enacted the Uniform Partnership Act ("UPA") in 1916, *Creel v. Lilly*, 354 Md. 77, 87, 729 A.2d 385, 391 (1999), and it governed partnerships for more than eighty years. Effective 1 July 1998, Maryland enacted the Revised Uniform Partnership Act ("RUPA"), Md.Code (1975, 1999 Repl.Vol.), § 9A–101 *et seq.* of the Corporations and Associations Article. The Circuit Court in the present case concluded that UPA, not RUPA, applied to these facts. We agree, concluding that the Legislature did not intend RUPA to have a retrospective reach so as to apply to the present case.

The general rule is that the partnership agreement governs the relations among the partners and between the partners and the partnership. *Creel,* 354 Md. at 87, 729 A.2d at 391. Where applicable statutes are concerned, East Park, as a limited partnership, is governed in the first instance by Maryland's Revised Uniform Limited Partnership Act ("RULPA"), Md.Code (1975, 1999 Repl.Vol.), § 10–101 *et seq.* of the Corporations and Associations Article, which took effect in 1982. Limited partnerships also were governed by UPA, Md.Code (1975, 1999 Repl.Vol.), § 9–101 *et seq.* of the Corporations and Associations Article, except where its provisions were modified by or inconsistent with RULPA. § 10–108.

In adopting RUPA, the Legislature clearly sought to eliminate some of UPA's harsh provisions. *Creel,* 354 Md. at 91, 729 A.2d at 393. Finalized in 1994 by the National Conference of Commissioners on Uniform State Laws, RUPA represents a complete rewriting of UPA and effectuates changes in seven major areas. *See generally* Robert W. Hillman et al., *The Revised Uniform Partnership Act,* introductory cmt. (2003 ed.). Among several changes relevant to the present case, RUPA contains a completely new and controversial articulation of a partner's fiduciary duties. *Id.* Unlike UPA, which co-existed with the common law, RUPA attempts to displace the common law and define the fiduciary duties of partners entirely by statute. *Id.* at § 404. Moreover, RUPA narrowly defines the fiduciary duties of partners and downgrades the

common-law fiduciary duty of good faith to the status of a non-fiduciary "obligation." *Id.* Accordingly, determining which Act applies is important and may prove dispositive to the outcome of the present case.

Upon its enaction in 1998, RUPA did not immediately replace UPA for all partnerships. RUPA contains a phase-in provision, § 9A–1204, which caused RUPA and UPA to coexist until 31 December 2002. *Creel,* 354 Md. at 81, 729 A.2d at 387. Section 9A–1204 determines the applicability of the respective Acts, providing in relevant part:

(a) *Before January 1, 2003.*—Before January 1, 2003, this title governs only a partnership formed:

(1) On or after July 1, 1998, unless that partnership is continuing the business of a dissolved partnership under § 9A–601 of this article; or

(2) Before July 1, 1998, that elects, as provided by subsection (c), to be governed by this title.

(b) *After December 31, 2002.*—After December 31, 2002, this title governs all partnerships.

(c) *Election before January 1, 2003.*—Before January 1, 2003, a partnership voluntarily may elect, in the manner provided in its partnership agreement or by law for amending the partnership agreement, to be governed by this title.

The Circuit Court applied UPA based on three determinations: (1) East Park came into existence prior to 1 July 1998; (2) East Park did not elect to be governed by RUPA as provided in § 9A–1204(c); and (3) all of the events which gave rise to this litigation occurred prior to 31 December 2002.

The Remaining Partners contend that UPA ceased to have any effect on 1 January 2003 and that RUPA should have been applied to reach an outcome in this case. They point to the fact that the Legislature added a termination provision to UPA, § 9–1001(b), which provides:

*Termination.*—[UPA] shall terminate and be of no effect after December 31, 2002.

■ Although the Circuit Court in the present case conducted the trial and entered final judgment after 1 January 2003, the time period during which the East Park dispute arose determines which Act applies. "... [A] statute, though applied only in legal proceedings subsequent to its effective date and in that sense, at least, prospective, is, when applied so as to determine the legal significance of acts or events that occurred prior to its effective date, applied retroactively." *State Ethics Comm'n v. Evans*, 382 Md. 370, 855 A.2d 364 (2004) (No. 125, September Term, 2003) (slip op. at 12–13, filed 30 July 2004) (quoting *Allstate Ins. Co. v. Kim*, 376 Md. 276, 289–90, 829 A.2d 611, 618–19 (2003)). Because the events at issue in the present case occurred prior to 1 January 2003, RUPA's application to this dispute among East Park's partners would be a retrospective one.

■ In determining whether a statute may be given retroactive effect, we engage in a two-part analysis. *Evans*, slip op. at 12. First, we must determine whether the Legislature intended the statute to have the kind of retroactive effect that is asserted. *Id.* Statutes are presumed to operate prospectively unless the Legislature "clearly expresses an intent that the statute apply retroactively." *Id.* If we conclude that the Legislature intended for the statute to have retroactive effect, we must then examine whether such effect would contravene a constitutional right or prohibition, for example, impairing vested rights or violating the prohibition against *ex post facto* laws. *See Evans*, slip op. at 12.

In the present case, to determine the Legislature's intent regarding retroactive application, we look to RUPA's applicability provision, § 9A–1204, and UPA's termination provision, § 9–1001. As we stated in *Bank of America v. Stine*, 379 Md. 76, 85–86, 839 A.2d 727, 732–33 (2003):

"...'[W]hen the statute to be interpreted is part of a statutory scheme, ... [we read it in context, together with the other statutes] on the same subject, harmonizing them to the extent possible....' *Mid–Atlantic Power Supply Ass'n v. Pub. Serv. Comm'n*, 361 Md. 196, 204, 760 A.2d

1087, 1091 (2000).... [W]e will presume that 'the Legislature' intends its enactments to operate together as a consistent and harmonious body of law" *Toler v. Motor Vehicle Admin.*, 373 Md. 214, 220, 817 A.2d 229, 234 (2003)....

■ In the UPA–RUPA coexistence scheme adopted by the Legislature we find no clear legislative intent to have RUPA retroactively apply to the circumstances of the present case. Read together, § 9A–1204 and § 9–1001 merely make clear the date on which the UPA–RUPA coexistence scheme ceased to exist. Had the Legislature intended RUPA to govern events such as evolved regarding East Park during 2002, it could have provided so in a number of ways. Instead, the Legislature chose, as codified at § 9A–1204(c), to give East Park the option to bring itself under RUPA for activities occurring during the transition period. East Park did not exercise that option.

Moreover, but of lesser significance, we agree with the Circuit Court and the Withdrawing Partners that the phrase "shall govern," found several times in § 9A–1204, intimates prospective application and refers to future partner conduct. The conduct at issue here occurred during 2002. Section 9A–1204(a) makes clear that RUPA would *not* govern East Park's partners' conduct during 2002 unless they so elected.

An extensive search for cases in other jurisdictions which may have addressed this question did not yield much; however, the scant authority discovered supports our conclusion that RUPA generally was not intended to have retrospective reach.[8] In *BT–I v. Equitable Life Assurance Soc'y of the*

---

**8.** Neither Appellants nor Appellees brought to our attention in their briefs any out-of-state cases with respect to this issue. Appellees rely on *Ross v. American Iron Works*, 153 Md.App. 1, 834 A.2d 962 (2003). There, with respect to a partnership formed prior to 1 July 1998, the Court of Special Appeals construed the "effective date" referred to in RUPA's savings clause, § 9A–1205, to be 31 December 2002. *Ross*, 153 Md.App. at 12 n. 2, 834 A.2d at 968 n. 2. § 9A–1205 provides:

[RUPA] does not affect an action or proceeding commenced or right accrued before this title takes effect.

*United States*, 75 Cal.App.4th 1406, 89 Cal.Rptr.2d 811 (1999), the California Court of Appeal applied California's then-repealed UPA in a decision filed nearly a year after California's RUPA took effect as to all partnerships. 89 Cal.Rptr.2d at 815 n. 4. Although the California Court of Appeal did not employ retrospectivity analysis or explicitly discuss California's UPA–RUPA coexistence scheme, it nevertheless applied UPA because the partnership at issue was formed before RUPA took full effect and had not elected to be governed by the Revised Act. *Id.*

In a subsequent case, the U.S. Circuit Court of Appeals for the Ninth Circuit's Bankruptcy Appellate Panel, applying California partnership law, also determined that California's UPA should be applied subsequent to its repeal. *See In re Tsurukawa*, 287 B.R. 515, 521 n. 6 (9th Cir.BAP 2002). Because the partnership completed its business and the appellee filed its complaint before RUPA took full effect, and the partnership had not elected to be governed by RUPA, the court concluded that UPA applied. *Id.*

The coexistence scheme and the specific language employed by the Maryland Legislature support, rather than rebut, RUPA's prospective application only. Accordingly, because the Legislature did not express clearly its intention to effect retroactive application, RUPA does not apply and UPA, where applicable, applies to this case.[9]

## IV.

The Circuit Court ordered East Park to wind up its affairs and distribute its assets to the partners pursuant to a conclu-

---

Appellees argue that § 9A–1205 also applies here because their amended complaint was filed before 31 December 2002. We agree with Appellants, however, that the effective date referred to in § 9A–1205 is 1 July 1998 and decline to follow *Ross*.

9. In their briefs, the *Remaining Partners* proffer arguments under RUPA with respect to the subsequent issues presented in this appeal. Because we conclude that RUPA is inapplicable to the present case, we need not address the Remaining Partners' RUPA-based contentions.

sion that Della Ratta caused East Park's dissolution in December 2001. The trial judge based this conclusion on his finding that Della Ratta assigned his interest in East Park to the Trust, which had the effect of his withdrawal as East Park's sole general partner. In light of the Agreement's anti-assignment clause, and the specific, limited remedy sought by the Withdrawing Partners, we hold that any assignment or attempted assignment of the general partner's interest was void at its inception and could not have resulted in Della Ratta's withdrawal or East Park's dissolution.

Under RULPA, a partnership interest in a limited partnership is assignable unless otherwise provided by the partnership agreement. § 10–702. Article 11(a) of the Agreement provides in relevant part: "[T]he General Partner shall not assign, mortgage, or sell his share in the Partnership. . . ." The parties and the Circuit Court agree that Della Ratta's purported assignment to the Trust was therefore improper. The dispute is over a specific legal effect of that improper assignment.

■■■ RULPA is silent regarding the legal ramifications of an assignment in contravention of a limited partnership agreement's anti-assignment clause. Because § 10–702 is a "default rule" and subject to modification by the partnership agreement, the Agreement's anti-assignment provision should be given effect. *See* § 10–702. A partnership is a contractual relationship to which the principles of contract law are fully applicable. *Klein v. Weiss*, 284 Md. 36, 63, 395 A.2d 126, 141 (1978). In determining the meaning of contractual language, we objectively interpret the language and, where the language is unambiguous, give effect to its plain meaning. *Wells v. Chevy Chase Bank*, 363 Md. 232, 250–51, 768 A.2d 620, 630 (2001).

In their amended complaint, the Withdrawing Partners essentially sought a declaration that the Agreement allows an assignment to destroy the partnership. The Agreement, however, is unambiguous in stating that the assignment, mortgage, or sale of a general partner's interest is prohibited. The

objective meaning and purpose of this prohibition is to prevent the general partner from unilaterally altering East Park's partnership structure.

 In general, we have adopted the rule that an assignment in violation of an anti-assignment clause is invalid and unenforceable. *Pub. Serv. Comm'n of Maryland v. Panda–Brandywine, L.P.*, 375 Md. 185, 203, 825 A.2d 462, 472 (2003). We now apply that rule in the context of a limited partnership agreement and, in light of the specific and limited remedy sought by the Withdrawing Partners, hold that Della Ratta's purported assignment was invalid and unenforceable from its inception. Because there was no effective assignment, Della Ratta did not withdraw and East Park was not dissolved.[10] We reverse the Circuit Court's declarations that Della Ratta's assignment implicitly was enforceable, that he withdrew as general partner, and that East Park was dissolved.

## V.

The Circuit Court concluded that the Withdrawing Partners had a statutory right to withdraw from East Park. We agree.

RULPA specifically addresses whether a limited partner may withdraw from a limited partnership. § 10–603 provides:

(a) *When specified by agreement.*—A limited partner may withdraw from a limited partnership at the time or on the happening of events specified in the partnership agreement. If the partnership agreement does not specify the time or the events on the occurrence of which a limited partner may

---

10. The Withdrawing Partners suggest that an assignor is estopped from challenging the validity of his assignment and enforcing an anti-assignment clause. We need not decide that question. As the Remaining Partners point out, Della Ratta is not alone in challenging his purported assignment. Several other East Park partners seek enforcement of the anti-assignment clause. They were not parties to the assignment and did not waive the anti-assignment clause. Therefore, they would not be estopped from enforcing the provision.

withdraw, a limited partner may not withdraw before the dissolution and winding up of the limited partnership.

(b) *When not specified by agreement.*—A limited partner may withdraw on not less than 6 months' prior written notice to each general partner at the general partner's address on the books of the limited partnership if the following conditions are met:

(1) The limited partnership was formed before October 1, 1998;

(2) On October 1, 1998, the partnership agreement of the limited partnership did not specify in writing the time or the events on the occurrence of which a limited partner may withdraw or a definite time for the dissolution and the winding up of the limited partnership; and

(3) The limited partnership did not amend its partnership agreement on or after October 1, 1998 to specify in writing the time or the events on the occurrence of which a limited partner may withdraw or a definite time for the dissolution and winding up of the limited partnership.

Section 10–603(b) sets forth conditions which must be satisfied in order for a limited partner to exercise a statutory right to withdraw. We first examine the words of the statute and if, giving them their plain and ordinary meaning, the statute is clear and unambiguous, our inquiry ends. *Stine,* 379 Md. at 85, 839 A.2d at 733.

▬ The Withdrawing Partners gave Della Ratta more than six months written notice of their withdrawal and thus satisfied § 10–603(b). In addition, East Park was formed before 1 October 1998, and the Agreement was not amended on or after that date to specify the time or events on the occurrence of which a limited partner may withdraw, satisfying §§ 10–603(b)(1) & (3), respectively. Of critical importance to the Withdrawing Partners' position, § 10–603(b)(2) also must be shown to be satisfied. If the Agreement specified the time or the events on the occurrence of which a limited partner may withdraw, then the Circuit Court was incorrect that the Withdrawing Partners had a statutory right to withdraw. In that event, § 10–603(a) controls and the Withdraw-

ing Partners only may withdraw in accordance with the terms of the Agreement.

To determine whether § 10–603(b)(2) was satisfied requires interpretation of the partnership agreement. The Remaining Partners point to four Agreement provisions which they contend specify the time or events on the occurrence of which a limited partner may withdraw, thus satisfying § 10–603(b)(2). Article 11(d) allows a limited partner to transfer his or her interest to limited categories of relatives, subject to the other partners' right of first refusal.[11] Article 11(f) provides a mechanism to handle a partner's incompetency or bankruptcy and grants the other partners the right to buy-out the incompetent or bankrupt partner's interest.[12] Article 11(k) allows a

---

11. Article 11(d) provides:

*Assignment of Interest of Limited Partner*—No Limited Partner shall dispose of any or all of his interest in the Partnership otherwise than by gift, bequest, sale or exchange to a spouse, ancestor, descendant, relative, brother or sister, without the written consent of sixty-six and two-thirds percent (66–2/3%) of the other partners, or, in the absence of such written consent, without first giving to the other partners, General and Limited, at least thirty (30) days in advance of such dispositions, written notice by registered mail of his intention to make the disposition. No such notice shall be given until the Limited Partner desiring to make the disposition, hereinafter called the Offering Partner, shall have obtained a bona fide written offer to purchase. A true copy of the offer setting forth all the terms and conditions of the proposed purchase, with the names and addresses of the purchaser or purchasers, shall be attached to the registered notice. For a period of thirty (30) days from the receipt of the registered notice, the other partners shall have the option to make the purchase from the Offering Partner under the same terms and conditions as are set out in the written offer. The other partners shall exercise the aforesaid option by giving written notice by registered mail to the Offering Partner. If such notice has not been given by the other partners by the expiration of the aforesaid thirty (30) days period, the Offering Partner shall be free to make the disposition; provided, however, that the disposition shall be made within ninety (90) days after such expiration and in strict accordance with the terms and conditions of the written offer. The aforesaid option is granted to all of the other partners in proportion to their respective Partnership interest; but if any of the other partners do not desire to exercise the option, his portion may be taken up pro rata by the remaining other partners.

12. Article 11(f) provides:

partner to pledge his or her partnership interest as security for a loan.[13] Should that partner incur a lien on his interest, the other partners may act against that partnership interest pursuant to Article 11(d). Article 13 concerns a limited partner's failure to satisfy a capital call or comply with an Agreement covenant.[14] In the event of such failure, the limited

---

If any Limited or General Partner shall be finally adjudicated an incompetent, or take advantage of any bankruptcy or insolvency act, of if any insolvency petition shall be filed against any Limited Partner and a final adjudication of insolvency entered thereon, or if any Limited or General Partner shall make an assignment for the benefit of his creditors, then, within ninety (90) days after receipt of written notice of each such adjudication or assignment, all of the other partners shall have the absolute option and right to purchase such Limited or General Partner's interest in the Partnership at a price equal to the value, as defined in Section 13, payable twenty percent (20%) in cash and the balance represented by a negotiable promissory note bearing interest at twelve percent (12%) pre annum, principal and interest amortized in sixty (6) equal monthly installments. This option and right is granted to all of the other partners in proportion to their respective Partnership interest; but if any partner does not desire to exercise the option, his portion may be taken up pro rata by the remaining partners. Any partner, General or Limited, shall become a Limited Partner as to such purchased interest and the Partnership shall continue. If no partner, General or Limited, exercises such purchase option to purchase such Limited Partner's interest, the Committee or Trustee in Bankruptcy of such incompetent or bankrupt Limited Partner shall become his substituted Limited Partner as to such Limited Partner's interest, and the Partnership shall continue. If no partner, General or Limited, exercises such purchase option to purchase such General Partner's interest, the Partnership shall dissolve in accordance with the provisions of Section 18.

**13.** Article 11(k) provides:

A partner, General or Limited, shall have the right to pledge his interest in the Partnership as security for a loan or in connection with any other transaction that may result in a lien on his interest in the Partnership. Should a partner suffer a lien to be obtained against his interest in the Partnership by way of attachment, or otherwise, his interest shall then become subject to the provisions of Article 11(d) and Article 14 herein; provided, however, such partner shall have the right to satisfy such lien or to redeem such pledge on his own initiative and shall submit to the Partnership evidence of such satisfaction or redemption within sixty (60) days of such lien, pledge or attachment.

**14.** Article 13 provides:

partner is deemed in default and his or her partnership interest sold to the other partners or a third-party selected by the general partner.

These Agreement provisions primarily preserve certain rights for the partnership vis-à-vis consanguinity limits on the transferability of a partner's interest, and for the remaining partners as regards a partner who declares bankruptcy, suffers a lien, or falls into default. The word "withdrawal," as used in § 10–603, connotes more, we think.

Our construction of the word "withdrawal" comes from our review of §§ 10–402, 10–602, & 10–604. Section 10–402 defines the "events of withdrawal" of a general partner and provides in relevant part:

> In the event a Limited Partner shall fail to make any installment of his capital contribution or comply with any of the covenants of this Agreement within twenty (20) days of notice from the General Partner, he shall thereby be deemed a defaulting Limited Partner[.] [T]he remaining Limited Partners shall have the option, for a period of twenty (20) days to purchase all of the interest of such defaulting Limited Partner. The remaining Limited Partners shall exercise such right of purchase in proportion tot he Limited Partnership profit and loss sharing rations of the Partnership. If any Limited Partner does not desire to exercise his portion of the optional right of purchase, then his portion may be exercised, pro rata, by the remaining Limited Partners. If the remaining Limited Partners or Partner does not desire to exercise such optional right of purchase, then such defaulting Limited Partnership interest shall be offered by the General Partner in his sole discretion to any person who may wish to become a Limited Partner in the place of the defaulting Limited Partner.
> The price to be paid for the interest of the defaulting Limited Partner shall be the amount of his capital contributions plus the amount paid to purchase outgoing partners less distributions, without interest, but in no event shall such amount exceed the amount of his capital contributions plus amounts paid to purchase outgoing partners to date of default. Payment, therefor, shall be made in cash by the Substituted Limited Partner to the defaulting Limited Partner, at the office of the Partnership on the 15th day following the twenty (20) days option period granted to the remaining Limited Partners. The capital account of the defaulting Limited Partner shall then be transferred on the Partnership books to the credit of the Substituted Limited Partner. The defaulting Limited Partner shall then have no further right or interest in the affairs of the Partnership.

A person ceases to be a general partner of a limited partnership upon the happening of any of the following events:

(1) The person's withdrawal from the limited partnership as provided in § 10–602 of this title;

(2) The person's removal as a general partner in accordance with the partnership agreement;

(3) Unless otherwise provided in the partnership agreement or with the consent of all partners, the person's:

(i) Making an assignment for the benefit of creditors;

(ii) Filing a voluntary petition in bankruptcy;

(iii) Being adjudged bankrupt or insolvent or having entered against him an order or relief in any bankruptcy or insolvency proceeding;

§ 10–602 relates to a general partner's withdrawal and provides:

A general partner may withdraw from a limited partnership at any time by giving written notice to the other partners, but if the withdrawal notice violates the partnership agreement, the limited partnership may recover from the withdrawing general partner damages for breach of the partnership agreement and offset the damages against the amount otherwise distributable to the withdrawing general partner.

§ 10–604 concerns distributions upon the withdrawal of a partner and provides:

Except as otherwise provided in this subtitle, on withdrawal any withdrawing partner is entitled to receive any distribution to which the partner is entitled under the partnership agreement and, if not other provided in the partnership agreement, the partner is entitled to receive, within a reasonable time after withdrawal, the fair value of the partner's partnership interest in the limited partnership as of the date of withdrawal, based on the partner's right to share in distributions from the limited partnership.

Because these provisions are part of RULPA's statutory scheme, we presume that the Legislature intended them to

operate together as a consistent and harmonious body of law. *Stine,* 379 Md. at 85–86, 839 A.2d at 732–33. Accordingly, the term "withdrawal" must have a consistent meaning in all three sections. In addition, that meaning should not render another part of the statute meaningless or nugatory. *Id.* at 86, 839 A.2d at 733.

Section 10–602 is the general-partner counterpart to § 10–603. In defining the events of withdrawal of a general partner, § 10–402 lists not only § 10–602, but also a general partner's removal, bankruptcy, or insolvency. If the word "withdrawal" as used in §§ 10–602 and 10–603 were to encompass the Agreement's removal, bankruptcy, and insolvency provisions, §§ 10–402(2) & (3) would be rendered redundant and meaningless. "Withdrawal" cannot be as broad as the Remaining Partners urge.

Moreover, "withdrawal" must have a consistent meaning in §§ 10–603 & 10–604. The distribution upon withdrawal referred to in § 10–604 would be paid by the partnership, not by a third-party purchaser or individual partners. This must be the same type of withdrawal contemplated by the Legislature in § 10–603. Harmonized, §§ 10–603 & 10–604 essentially allow a partner to "cash out" his or her equity before the partnership terminates. That is a different scenario than the events provided for in Agreement sections 11(d), 11(f), 11(k), and 13 where a partner would receive payment from a third-party or other partners. We conclude that the Agreement, within the meaning of § 10–603(a), does not undertake to specify the time or the events on the occurrence of which a limited partner may withdraw from East Park. We hold that the Withdrawing Partners had a statutory right to withdraw from East Park and affirm the Circuit Court's grant of summary judgment on that issue.

## VI.

The Circuit Court determined that Della Ratta did not have the authority to issue the capital call in controversy here and that, even if he were imbued with such authority, advancing

the due date, under these circumstances, was a breach of his fiduciary duty as general partner and in bad faith. Because we agree with the Circuit Court that Della Ratta breached his fiduciary duty and acted in bad faith, we shall assume, without deciding, he had the authority to issue the capital call.

To determine whether Della Ratta's actions constituted a breach of fiduciary duty and bad faith we undertake a two-stage review. First, we review for clear error the Circuit Court's underlying findings of fact, leaving them undisturbed if supported by a preponderance of the evidence. *Colandrea*, 361 Md. at 394, 761 A.2d at 911. Second, applying a *de novo* standard, we must determine whether the trial judge correctly concluded that the facts, as he found them to be, legally constituted a breach of fiduciary duty and bad faith. *See Miller*, 362 Md. at 372, 765 A.2d at 593.

The Circuit Court found that "a significant motivation for Della Ratta issuing the capital call was to squeeze out some of the limited partners." The trial judge did not believe Della Ratta's testimony regarding his motivation for issuing the capital call and found Della Ratta's actions to be "completely self-serving." In addition, the Circuit Court found that Della Ratta advanced the date of the capital call in order to "out-maneuver" the Withdrawing Partners and block them from exercising their statutory right to withdraw.

The Circuit Court further found that Della Ratta's failure to explore alternatives "less oppressive" than the capital call showed a lack of good faith, particularly because such options were readily available at the time. Expert testimony adduced before the trial court established that financing was available at historically low rates and that refinancing would have been prudent and typical in East Park's business under the circumstances. Nevertheless, Della Ratta never explored refinancing even though he told the limited partners he would do so.

We conclude that the Circuit Court's findings of fact were supported by the record and not clearly erroneous. The trial judge's findings largely were based on credibility determinations which ordinarily will not be disturbed by an appellate

court. In addition, the written correspondence between Della Ratta and the Withdrawing Partners tends to confirm the Circuit Court's conclusions by demonstrating, in Della Ratta's own words, his advancement of the capital call due date in response to the Withdrawing Partners' withdrawal notice. We note that the Remaining Partners did not point to in their briefs any evidence contradicting the Circuit Court's conclusions. Indeed, they did not challenge the trial judge's findings of fact in this regard.

The partnership relationship is a fiduciary one, a relation of trust. *Allen v. Steinberg,* 244 Md. 119, 128, 223 A.2d 240, 246 (1966). Managing or general partners particularly owe a fiduciary duty to inactive partners. *Id.* Moreover, the partnership relationship carries with it the requirement of utmost good faith and loyalty. *Herring v. Offutt,* 266 Md. 593, 597, 295 A.2d 876, 879 (1972). As Justice Cardozo, then Chief Judge of the New York Court of Appeals, stated:

> "Many forms of conduct permissible in a workaday world for those acting at arm's length are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions.... Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd."

*Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545 (1928) (quoted in *Herring,* 266 Md. at 597, 295 A.2d at 879).

The Remaining Partners analogize the present case to one occurring in a corporate setting and then rely on *Lerner v. Lerner Corp.,* 132 Md.App. 32, 750 A.2d 709 (2000), in which the Court of Special Appeals held that a reverse stock split which had the effect of eliminating a minority shareholder was proper and justified. Although we have analogized the rela-

tionship between general and limited partners to that between corporate directors and shareholders, *Klein,* 284 Md. at 59, 395 A.2d at 139, we find the Remaining Partners' reliance on *Lerner* inapt here. In *Lerner,* the force-out of the minority shareholder was preceded by twelve years of internal conflict and dissension. 132 Md.App. at 49, 750 A.2d 709. The corporation had spent over $2,000,000 in legal fees to resolve disputes with the minority shareholder and the time spent in litigation had diverted executive officers from managing the corporation. *Id.* These facts, which surely influenced the Court of Special Appeals's conclusion that the force-out was lawful, are much different than the facts presented here. Della Ratta did not act to force-out the Withdrawing Partners in response to a longstanding or resource-draining dispute among the partners. Rather, the singular dispute at issue here arose only after Della Ratta issued the capital call and tried to force-out the Withdrawing Partners.

The Remaining Partners also ask us to apply the business judgment rule, an accepted principle applied to corporate matters, as part of Maryland partnership law. That rule, codified at Md.Code (1975, 1999 Repl.Vol.), § 2–405.1 of the Corporations and Associations Article, insulates business decisions made by those lawfully in charge of corporate decision-making from judicial review, absent a showing that the officers or directors acted fraudulently or in bad faith. *See NAACP v. Golding,* 342 Md. 663, 673, 679 A.2d 554, 559 (1996). We need not decide here whether the business judgment rule applies to partnerships. Even if we were to apply it as requested, the business judgment rule requires that the decision maker act in good faith and on an informed basis. *See Yost v. Early,* 87 Md.App. 364, 377, 589 A.2d 1291 (1991). As found by the Circuit Court, Della Ratta acted in bad faith and was not fully informed of alternative business possibilities because he did not explore, despite saying he would, refinancing options for the Aegon Loan. Indeed, the Circuit Court did not find credible Della Ratta's purported business reasons for issuing the capital call in the first instance.

We affirm the Circuit Court's decision that Della Ratta breached his fiduciary duty to the Withdrawing Partners and acted in bad faith.[15] As the sole general partner, Della Ratta owed a high fiduciary duty to the Withdrawing Partners, all of whom were inactive limited partners. Della Ratta's decision not to pursue refinancing options after assuring the Withdrawing Partners he would, and his decision to force-out the Withdrawing Partners and place them into default, did not comport with his fiduciary duty and were in bad faith. Moreover, we conclude that the Circuit Court did not abuse its discretion in enjoining the Remaining Partners from enforcing the capital call.

## VII.

Although it is not entirely clear from the record, it appears that the Circuit Court's final judgment was based in part upon its finding that Della Ratta assigned his East Park interest and thereby caused the partnership's dissolution. Pursuant to those findings, the Circuit Court ordered East Park to wind up its business affairs and distribute its assets to the partners. Because we find that conclusion regarding dissolution to be erroneous, we vacate the judgment and remand the case to the Circuit Court for further proceedings not inconsistent with this opinion.

*JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLANTS.*

---

**15.** Although we have concluded that UPA, not RUPA, applies to the present case, we note without deciding that Della Ratta's actions may have been unlawful under either Act. The Remaining Partners contend that RUPA lowers the standard to which a general partner must conform his conduct. Even if we were to accept that contention, under RUPA, general partners nonetheless must discharge their duties and "exercise any rights *consistently with the obligation of good faith and fair dealing.*" § 9A–404(d) (emphasis added). Although our analysis might differ under RUPA, we cannot say that the outcome would change.