908 A.2d 724

Colleen L. LAYTON et al.

v.

HOWARD COUNTY BOARD OF APPEALS.

No. 1715, Sept. Term, 2005.

Court of Special Appeals of Maryland.

Oct. 2, 2006.

138

Albert Figinski (Fred M. Lauer, on brief), Baltimore, for appellant.

Thomas M. Meachum, Columbia, Barry M. Sanders, Ellicott City (David A. Carney, on brief), Columbia, for appellee.

Panel DAVIS, HOLLANDER and EYLER, JAMES R., JJ.

DAVIS, J.

Appellants, Colleen Layton and Scott Robbins, dba Frisky's Wildlife and Primate Sanctuary, Inc., appeal the decision of the Circuit Court for Howard County, affirming the decision of the Howard County Board of Appeals, which had granted, in part, the petition of appellants for a Special Exception for a Charitable and Philanthropic Institution and a Variance to reduce the required thirty foot side yard setback to twenty feet for a pole barn, said variance to be subject to certain conditions.[1] On April 20, 2000, appellants filed a petition for a

---

1. The other parties to the proceedings in the circuit court, Richard Wyckoff and Julianne Tuttle (Wyckoff), filed their brief as appellees

variance for a charitable and philanthropic institution in a Rural Conservation–Density exchange Option Overlay Zoning District (RC–DEO). The petition was filed pursuant to §§ 131.N.13 and 130.B.2 of the Howard County Zoning Regulations. On August 9, 2000, the Planning Board issued a recommendation that Frisky's request for a special exception be approved, subject to a number of conditions.

Per the conditions imposed by the Planning Board, appellants petitioned the Board of Appeals for a variance. The Board met to consider the petition on July 10, November 1, November 15, 2001 and January 3, March 7, March 14, April 9, April 23, May 7, June 6, June 27, July 18, August 29, October 22, 2002 and October 28, 2003. A written decision was issued by the Board on May 18, 2004, granting an exception for a charitable and philanthropic institution and a variance to reduce the required thirty foot side yard setback to twenty feet, in order to accommodate a previously constructed pole barn. Although Frisky's was also granted permission to operate an animal rehabilitation center on the property, the request for an exception to operate a primate or other wildlife sanctuary was denied. Finally, the Order conditionally granting the relief requested was subject to conditions regarding dates for yard sale operations.

In its conditional grant of Frisky's Petition for a Variance, the Board ruled:

21. The Board finds that although the [appellant] may have a license to exhibit animals at the Center, the [appellant] initially did not apply to be an animal exhibitor and subsequently failed to provide sufficient evidence during the course of the hearings held before the Board to determine that the [appellant] is, in fact, an animal exhibitor. The Petition presented to the Board as well as the testimony given by the [appellant] describes the activities of the Center as a charitable institution for the rehabilitation and sanctuary of ani-

along with the Howard County Board of Appeals (the Board), and we shall refer to the appellee in this regard throughout the opinion.

mals and not for displaying or exhibiting the animals to the public. The [appellant] did not request approval as a wildlife or exotic animal exhibitor nor was Frisky's petition reviewed by DPZ or the Planning Board as an animal exhibit facility. The mere existence of a visitor policy does not change the [appellant's] proposed use for the subject Property into that of an animal exhibitor. The purpose of the Center is to maintain a preserve and sanctuary for animals. The animals at the Center are not kept there for the purpose of public exhibition. Board Opinion page 8.

5. The Board concludes that although the [appellant] may have an exhibitor's license, the [appellant] failed to provide sufficient evidence during the course of the hearings for the Board to determine that the [appellant] is, in fact, an animal exhibitor rather than a sanctuary and rehabilitation center for animals, the exemption for exhibits in Section 17.306(e)(4) of the Howard County Code does not apply because the [appellant] did not prove to the Board that she was an exhibitor and the [appellant] cannot therefore legally keep primates or other wild or exotic animals on the subject Property. Board Opinion page 9.

Frisky's, on June 17, 2004, and Wyckoff, on June 25, 2004, filed petitions for judicial review in the circuit court.

In the petition, Wyckoff contended that (1) Frisky's did not qualify for the Special Exception under the HCZR; (2) Frisky's is not a charitable institution and should not qualify for the special exception use approved by the Board; and (3) the record does not contain substantial evidence to support the Board's grant of a setback variance related to the pole barn. Answering these allegations by Wyckoff, Frisky's retorts that (1) Wyckoff did not have standing to appeal the decision of the Board of Appeals; (2) the HCZ zoning permitted Frisky's as a charitable or philanthropic institution; (3) Frisky's is a charitable institution; and (4) Frisky's presented evidence that a variance was necessary for the pole barn.

On January 18, 2005, Frisky's filed a memorandum in support of its petition for judicial review in which it alleged that (1) the Board erred in finding that Frisky's did not submit sufficient evidence to show that it is a wildlife or exotic animal exhibitor and the Board's decision should be remanded to consider revisions made to the Howard County Code that, as amended, permitted animal sanctuaries that provide permanent housing to exotic animals. In response thereto, Wyckoff filed a memorandum on March 7, 2005, alleging that (1) the evidence presented to the Board relating to Frisky's status as an exhibitor was "fairly debatable"; (2) revisions to the Animal Control Act do not apply retroactively to Frisky's; and (3) regardless of what the current Animal Control Act permits, animal sanctuaries are not permitted in any zoning district in the County. The Board, On March 8, 2005, filed an Appellee's Answering Memorandum, requesting that the circuit court affirm the Board's decision and dismiss the appeals of both Frisky's and Wyckoff. Wyckoff, on March 22, 2005, in a Reply Memorandum, responded to the Answering Memoranda of the Board and Frisky's. A reply memorandum was filed by Frisky's on March 22, 2005, addressing the issues raised in its original memorandum and responding to the Answering Memoranda of the Board and Wyckoff.

The circuit court, in affirming the decision of the Board of Appeals, issued the following memorandum opinion, in pertinent part:

Preliminarily, Frisky's claims that Wyckoff's Petition should be dismissed because Wyckoff failed to plead that they have standing to appeal this matter. "Any person or persons, jointly or severally, aggrieved by any decision of the board of appeals . . . may appeal the same to the circuit court of the county." Maryland Code, Article 66B § 4.08(a). "If the petitioner was not a party [to the underlying Board of Appeals action], the petition shall state the basis of the petitioner's standing to seek judicial review. No other allegations are necessary." Md. Rule 7–202(c). Wyckoff claims, "the [appellants] here were opponents before the Board." Wyckoff Memorandum at 1.

The Court is satisfied that Wyckoff may pursue the appeal and has sufficient standing to do so.

1. Did the Board err when it found that Frisky's submitted insufficient evidence to support the approval of Frisky's as a wildlife or exotic animal exhibitor?

Frisky's first allegation of error is that the Board incorrectly concluded that Frisky's "failed to provide sufficient evidence during the course of the hearings for the Board to determine that [it] is, in fact, an animal exhibitor rather than a sanctuary and rehabilitation center for animals." D & O at 9. Generally, "no person may keep, hold for sale or sell wild or exotic animals." Code, § 17.306. However, "the holder of a currently valid permit issued by a state or federal authority to keep animals for scientific research, study, or exhibits is exempt from the [general prohibition] only to the extent provided in the permit." Code, § 17.306(e)(4). Frisky's claims that the wording of the exception makes it mandatory if the requirements are met.

Since "exhibitor" is not defined in the Howard County Code, Frisky's asserts that the Board should accept the definition promulgated by the United States Department of Agriculture (hereinafter "USDA"). The USDA defines "exhibitor" as "any person (public or private) exhibiting animals, which were purchased in commerce, or will affect commerce . . . this term includes zoos and educational exhibits, exhibiting such animals whether operated for profit or not." 9 CFR 1.1.

Frisky's goes on to allege that it provided sufficient evidence to meet the exemption provision as an exhibitor under § 17.306(e)(4). Frisky's alleges that the mere existence of the permit, and its provisions to the Board, is *prima facie* evidence to grant the exception. Frisky's alleges that it provided to the Board on November 1, 2001 a copy of their USDA "Class C" exhibitors' license, which was issued on August 14, 2001. (Transcript C–11–12). "At the hearing held before the Board on November 1, 2001, the [appellant] submitted documentation that Frisky's had obtained a 'Class C' Exhibitor" license pursuant to the Animal

Welfare Act (7 U.S.C. § 2131 et seq.) from the United States Department of Agriculture. (D & O at 4). A "Class C" exhibitor may buy or sell the exhibited animals as a means to maintain the collections of animals for exhibit. 9 CFR 2.1. Frisky's also submitted testimony regarding the license at the January 3, 2002 hearing before the Board. (Transcript D–13–21). Next, Frisky's alleges that the members of the Board unanimously agreed that Frisky's amended its petition by submitting the USDA License, and that the amendment was not substantive, because "they're still abiding by the same policy that they filed under and are doing the same, similar things." (Transcript D–41–43). Further, Frisky's points to a February 20, 2004 Memorandum from the Office of the County Solicitor which concluded that Frisky's "is exempt from the provisions of Section 17.306(e)(1) of the Code, as long as it maintains this federal license." While the opinion was admitted into evidence before the Board, it was only advisory upon them.

The Board alleges that, due to a lack of sufficient evidence, Frisky's did not prove that it was an exhibitor. The Board found that although Frisky's had a license to exhibit animals, Frisky's did not initially apply with the County to be an animal exhibitor. (D & O at 9). The Board claims that Frisky's did not petition either for a permit as a center for public exhibition or to operate as a wildlife or exotic animal exhibitor, but rather to keep a preserve and sanctuary for animals. (D & O at 8). The Board found that Frisky's does possess an exhibitor's license, but that such license is insufficient evidence to prove that Frisky's is an animal exhibitor. (D & O at 9). The Board claims that it must be provided sufficient evidence before it may determine if the [appellant] is an animal exhibitor. (D & O at 8–9). It goes on to allege that the evidence submitted by Frisky's "described the activities of the proposed use as a charitable institution for the rehabilitation and sanctuary of animals and not for displaying or exhibiting the animals to the public." (Transcript, C–7). Frisky's set forth evidence that they do not permit the general public to take tours of the facility. (Transcript, D–16–19). However, Frisky's also

put on testimony that the general public is permitted to view the facility, if the individuals are over age sixteen and make an appointment two weeks in advance. (Transcript, D–19–20). In their final conclusion, the Board found that the § 17.306(e)(4) exemption does not apply to Frisky's, and it may not legally keep wild or exotic animals or primates. (D & O at 9).

Wyckoff alleges not only that the Board was correct in determining that Frisky's is not an exhibitor, but also that the Board was correct in finding that the mere fact that Frisky's possesses an exhibitor's permit does not make it an animal exhibitor. (D & O at 8).

The Court agrees with the Board and Wyckoff that the Board did not err in concluding that the exemption for exhibitors did not apply to the special exception petition. Simply put, Frisky's did not prove to the Board's satisfaction that it was an exhibitor. *See* Decision and Order at page 9. The Board acknowledged that Frisky's did acquire a license to exhibit animals, but it found that it had not applied to be an animal exhibitor with the Board and also that it failed to prove to the Board's satisfaction that it was, in essence, an animal exhibitor. In the Board's view, the credible testimony supported the conclusion that Frisky's was a charitable institution for the rehabilitation and sanctuary of animals. It was not incumbent on the Board to have to conclude on the record that Frisky's had shown itself to be an exhibitor. The mere fact that it acquired a federal license to be an exhibitor and that judgment was made by a different agency, at a different level of government, for different purposes, did not tie the Board's hands or require only one result by the Board. This was left to their judgment and discretion, which the Board fairly exercised. The Court does not find a basis to reverse it.

2. Did the Board err in applying a previous version of the Howard County Zoning Regulations, which has since been updated?

Wyckoff alleges that the Board incorrectly applied the previous version of the Howard County Zoning Regulations

to the instant case. The Howard County Code provides that, "any amendment or charge to the Zoning Regulations, whether previously or hereafter adopted, shall be applicable to all pending and future proceedings and actions of any Board, Hearing Examiner or agency ... unless the amendment or change expressly provides that it only applies to future proceedings and actions." HCZR § 100(E). *See also Washington Suburban Sanitary Commission v. Riverdale Heights Volunteer Fire Co., Inc., et al.,* 308 Md. 556, 560, 520 A.2d 1319, 1322 (1987). The Council went on to clarify that "cases that require a Decision and Order are considered pending unless the Decision and Order is signed by the Board ... prior to the date the legislation is adopted." HCZR § 100(E)(1). In Maryland, "statutes are presumed to operate prospectively unless the Legislature 'clearly expresses an intent that the statute apply retroactively.'" *Della Ratta v. Larkin,* 382 Md. 553, 566, 856 A.2d 643, 651 (2004) (*quoting State Ethics Comm'n v. Evans,* 382 Md. 370, 387, 855 A.2d 364, 374 (2004)). There is an exception to the County provision, allowing "any conditional use application filed on or before March 5, 2001 shall be subject to the regulations in effect prior to the effective date of Council Bill No. 11–2001." HCZR § 100(E)(1)(a). However, not only must the legislative body evince a clear intent for the enactment to apply retroactively, but the court must also determine that retroactive application will not infringe upon a right vested in a party. *Della Ratta,* 382 Md. at 566, 856 A.2d 643.

As to the "conditional use" qualification to the exception, the HCZR defines "conditional uses" as "land uses and activities which require approval by the Board of Appeals for a specific location and site plan, based upon standards established in [the HCZR]. Formerly called special exceptions." HCZR § 103.A.28. The request for a variance issuance from the Board is clearly a "conditional use" under HCZR § 103.A.28. In regards to the application date, this case was already before the Planning Board of Howard

County on July 27, 2000, almost a full year before the effective date of Council Bill No. 11–2001.

Wyckoff alleges that while the "savings clause" saves prior applications from Council Bill No. 11–2001, no "savings clause" exists for the changes in the April 2004 HCZR. Wyckoff argues that if the County Council wanted to have all of the HCZR changes apply retroactively, then each provision would require its own savings clause. Additionally, Wyckoff alleges that the amended act is substantive, not procedural, and therefore cannot be retroactively applied. However, no distinction is made in the statutory or case law between substantive and procedural statutory amendments. *See Della Ratta,* 382 Md. at 566, 856 A.2d 643 and *Evans,* 382 Md. at 387, 855 A.2d 364.

The Board asserts that the arguments put forth by Wyckoff and Tuttle are not meritorious because it applied the law and specifically that Section 100.E of the April 13, 2004 zoning regulations did not require it to apply the new law to this application. The Court agrees with the Board and rejects the argument that it could not approve the proposed use.

The Court also agrees with the Board that a remand is not necessary for it to revisit its decision; the Court therefore accepts the Board's arguments on this point.

3. Did the Board err when it granted to Frisky's a special exception as a Charitable and Philanthropic Institution under HCZR?

In its May 18, 2004 Decision and Order, the Board granted Friskys' Petition for a special exception for a charitable and philanthropic institution. (D & O at 14). Specifically, "the Board conclude[d] that [Frisky's] operates the center as a charitable institution for the rehabilitation and sanctuary of animals on the property." (D & O at 9). A charitable or philanthropic institution is "a private, non-profit organization whose primary function is to provide either health, social, religious or benevolent services." (HCZR § 103.A.16). Additionally, "a determination of

whether an institution is charitable must include a careful examination of the stated purposes of the organization, the actual work performed, the extent to which the work performed benefits the community and the public welfare in general, and the support provided by donations." *State Dept. of Assessments and Taxation v. North Baltimore Center, Inc.,* 129 Md.App. 588, 593, 743 A.2d 759, 762 (2000) (quoting *Supervisor of Assessments of Montgomery County v. Group Health Ass'n, Inc.,* 308 Md. 151, 157, 517 A.2d 1076, 1079 (1986)).

\* \* \*

Wyckoff's arguments as to the lack of any charitable or benevolent purpose were not persuasive to the Board. The Board had ample evidence before it to support the conclusion it reached. The Board's interpretation and application of the special exception provisions of Section 131 of the Zoning Regulations, which the Board administers, must be given considerable weight by the Court. *See Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 68–69, 729 A.2d 376 (1999). The Court has little trouble here since the Board's conclusion seems fully supported by the evidence and within the ambit of the legal strictures governing it.

4. Did the Board err in granting to Frisky's a special exception for a setback variance for a Pole Barn?

In an "RC–DEO"—designated zoning district, such as the one in which Frisky's is located, the minimum side yard setback requirement for a structure is 30 feet. HCZR § 104(E)(4)(a)(3)(b). However, Wyckoff alleges in his Memorandum that the Board erred in granting a setback variance to Frisky's for a pole barn, to a maximum of 20 feet. The Hearing Authority may grant such a variance to the setback requirement if five separate requirements are met, such requirements designed to balance and protect the interests of both the individual requesting for [sic] variance, and also neighboring property owners. See HCZR § 130(B)(2). Of those five requirements, the only one at

issue is HCZR § 130(B)(2)(a)(1), which requires "that there are unique physical conditions, including irregularity, narrowness or shallowness of lot or shape, exceptional topography, or other existing features peculiar to the particular lot; and that as a result of such unique physical conditions, practical difficulties or unnecessary hardships arise in complying strictly with the bulk provisions of these regulations." Specifically, the petitioner must submit to the Board evidence to show that the property is unique when compared with other properties located in the same neighborhood. *Cromwell v. Ward,* 102 Md.App. 691, 726, 651 A.2d 424, 441 (1995). *See also Umerley v. People's Counsel for Baltimore County,* 108 Md.App. 497, 507–08, 672 A.2d 173 (1996).

\* \* \*

This Court's review leads it to conclude that the Board reasonably determined that as a result of the unique features of the property, Frisky's was faced with a "practical difficulty" in complying with the setback restriction. This conclusion was based on a careful review by the Board that included a review of the zoning maps, vicinity maps and the testimony on the issue. While one may reasonably disagree with the Board's conclusion that the narrow width, the topography and the location of the septic tank should lead to granting a variance, it is hard to argue that their conclusion is not a "fairly debatable" one that falls within the Board's permissible choices given the record before it. Their conclusion was within their discretion and supported by sufficient evidence. This being the case, the Court should not second-guess the result.

(Footnotes omitted.)

From the Order of the circuit court, this timely appeal was filed, in which Frisky's raises the following issues for our review:

I. Whether because the Board of Appeals clearly found that Appellants operated an animal sanctuary, and because the Howard County Animal Control Law was amended during the course of this litigation, the new

comprehensive, remedial law should be applied to Appellants' request and the matter remanded to the Board for application of the new law?

II. Whether the Board committed reversible errors by (A) defiling its process by attacking the failure to obtain certain reviews after it voted to forgo those reviews (B) disregarding valid evidence including a Federal License and a County Solicitor's letter of advice, and (C) failed to explain its conclusions properly?

## FACTUAL BACKGROUND

Appellants have operated a wildlife refuge and sanctuary in Howard County since 1976. They have operated at their current location, 10790 Old Frederick Road, Woodstock, Maryland since 1993. The property is described as a 3.728 acre lot in a Rural Conservation—Density Exchange Option (RC–DEO) zoning district in the Second Election District on the north side of MD 99, 700 feet west of Woodstock Road. To the North of the subject property is an improved lot with a single family detached dwelling, which is buffered by Evergreen trees. To the East of the subject property is the lot owned by Wyckoff, which is an improved lot with a single family dwelling located approximately seventy feet from the subject property. The Wyckoff property shares a common driveway with the subject property.

Frisky's was incorporated in 1998, as a not-for-profit corporation. Frisky's functions as an animal rehabilitation center and primate sanctuary, whose activities include care and rehabilitation of "wildlife that have been injured or orphaned; domestic animals such as rabbits, and farm animals that are sick or who have become pets, but can't be kept by their owners; and primates that come from laboratories, sanctuaries or private owners around the country before it became illegal to own primates without a license." Colleen Layton is Frisky's proprietor and there are no other employees. Frisky's is operated primarily by Layton twenty-four hours a day, seven days a week, with the help of volunteers, currently

numbering about twelve. According to Layton, wildlife reha-
bilitation consists of assessing the injuries of orphaned, dis-
placed or injured animals, and returning them to the their
habitat or designated areas of the state park. With respect to
the farm animals, Layton testified that individuals bring them
in as unwanted pets, and she tries to find them appropriate
homes. The animals remain at Frisky's until an "experienced
home that has a vet" is found.

Within the boundaries of the property, there is a residence,
two garages, a barn and several other structures, which will
be described, *infra*. An infirmary is located in the basement
of the residence, with support areas, including a kitchen. The
infirmary is a five hundred square foot room, which also has
cages to house some of the primates. A deck adjacent to the
kitchen is used to store toys and other items. Among the
other structures on the property, there are three primate
houses which provide indoor shelter and secure outdoor cages.
In addition, there are dog runs, a goat run, a horse pasture,
chicken and duck coops. The property has several storage
sheds and a pole barn. At the time of the hearings, there
were twenty-seven primates living at Frisky's, consisting of
four species: Macaque, Squirrel, Capuchin and Vervet Guen-
on.

On December 14, 1999, appellants were issued a notice for
violating a zoning regulation by operating a charitable and
philanthropic institution without an approved special exception
by the Howard County Department of Planning and Zoning
(Planning and Zoning). On July 27, 2000, Planning and
Zoning considered appellants' petition "for a Special Exception
for a Charitable and Philanthropic Institution for an existing
wildlife rehabilitation center and primate sanctuary." On
August 9, 2000, Planning and Zoning recommended approval
of appellants' petition subject to correction of nine conditions,
two of which were disposed of prior to the issuance of the
recommendations. The matter proceeded to the Board of
Appeals, which received testimony from a number of witnesses
over a period of approximately two years. The conditions

attached to the recommendations from Planning and Zoning included:

1. The Special Exception shall apply only to the existing wildlife rehabilitation center and primate sanctuary as described in the petition, and as depicted on the plan for Frisky's Wildlife & Primate Sanctuary, or as may be revised by the Board, and not to any other activities, uses, or structures on the Property.

2. Any encroachments of existing structures or uses into the required 30 foot side setbacks shall be eliminated or the Petitioner shall obtain approval for variances for the encroachments.

3. The portion of the West Use Area which extends beyond the front wall of the existing dwelling shall be buffered on the east side by landscaping.

4. Screening shall be provided along the common east side lot line, from the driveway on lot 1 to the rear property line of the Property.

5. Landscaping shall be placed within the lawn area at the center of the circular drive to screen and buffer the view of Primate House 1 and activities in the circular driveway from the house on Lot 1.

6. Evergreen landscaping shall be planted along the east side of the parking lot, replacing the large sign in that location, to appropriately screen the parking spaces from Lot 1.

7. The outside primate enclosures on the southwest side of Primate House 1 shall be screened with landscaping on its east side, to buffer potential sounds or these particular enclosures shall be entirely removed, leaving only the enclosures on the northwest side of Primate House 1.

At the July 10, 2001 hearing, the primary concern was whether Frisky's was permitted to operate a primate sanctuary. The proffer from appellants' counsel was that she was in the process of obtaining the necessary license to care for

primates. The concern then turned to whether the acquisition of the exhibitor's permit would, in effect, change the nature of appellants' requests from that of a sanctuary. In response, appellants' counsel stated:

The permit that's at issue here, it's called an exhibitor's permit. The exhibitor's permit, what it requires is that people see what's there and people are educated about what's there, the animals that are there. Currently, people drive by to drop off donations. The public comes by to drop off. Also the public comes to the facility to adopt the farm animals. In order to adopt the farm animals, you have to walk past the primate house. According to the USDA, that qualifies as exhibition. We have no intention whatsoever of having a turnstile installed and having advertising and having whatever you see at the National Zoo, that's not what's going to happen. What's going to happen next week is the same thing that happened last week. There's no intention whatsoever to alter in any manner the way that this operated, other than now we're technically going to be in compliance with the Animal Control law.

The Board, without considering the issues, continued the hearings for ninety days to allow appellants to complete the process and possibly obtain the license.

At the November 1, 2001 meeting, appellants presented a "class C" exhibitor's license granted by United States Department of Agriculture (USDA) on August 13, 2001, which permits the holder to house and exhibit primates. Wyckoff's counsel offered his disagreement with appellants' proffer to the board during the July 10, 2001 meeting, concerning the exhibitor's permit. He argued:

And you will note that the under the County's animal control law it's a public protection services law. That is, it's intended to take care of the public health, safety and welfare. The USDA permit that they've obtained as an exhibitor has nothing to do with the public health and safety and welfare and the exemption that's covered in the animal control laws deals with the protection of the public. You will see in the provisions of the attached USDA law that the

purpose of Department of Agriculture's problems with respect to animals is the protection of the animals. What they care about is how a keeper of those animals takes care of them.

Wyckoff continued, arguing that the definition of exhibitor under the federal statutes was in the nature of a zoo or museum. Additionally, Wyckoff presented evidence that certain activities were exempted from USDA licensing, such as a private zoo or shelter, and that is what appellants are requesting. In essence, Wyckoff's counsel argued that appellants were required to inform the Board of their exact status, either as an exhibitor, or as a sanctuary. If appellants were to classify themselves as an exhibitor, then the choice became whether they were going to operate under their proffer from July 10, 2001, which would require dismissal or whether they could then demonstrate to the Board that they are in compliance with USDA as a true exhibitor. Robert Sharps, a member of the Board of Appeals, asked appellants' counsel, "Now are you asking this Board to consider you as an exhibitor or as a primate sanctuary," to which the response was: "As an exhibitor with a specific spelled out, limited, myopic limitation on that and the times in which exhibits can occur."

Robert Adams was the first witness called by appellants. Adams is a doctor of Veterinary Medicine with twenty seven-years of experience working with non-human primates in the area of biomedical research. He considered himself an expert on primates and primate diseases. Adams testified that the Macaques were particularly susceptible to tuberculosis and herpes virus B, as well as bacterial diseases. Monkeys held in captivity may have fewer diseases, but are not disease free. The mechanism for disease transfer, in most cases, is "some sort of fairly intimate contact, fairly close contact." He stated he has never known of anyone that has caught a disease by simply being in the same room as the primates. The likelihood of a human contracting a disease from the primates without physical contact, he stated, is fairly small. Members of the Board questioned Adams as to whether requiring

appellants to conform to an exhibitor type license would increase the hazards, to which he responded that he did not think there was any more risk because the public and the primates are kept separate.

After hearing from Adams, the Board raised concerns as to whether appellants' petition for the variance and special exception was substantially changed as a result of the USDA license, and appellants' attempt at bringing Frisky's within the provision of the Howard County Code that required the license. One concern apparently was that the Planning Board had not made its recommendations based upon appellants operating as an exhibitor, but as a sanctuary, as well as the Board's uncertainty as to requirements that USDA would place on appellants. The Board heard proffers from both counsel and then met in a closed session to consider if it would consider a motion to determine if appellants' change from sanctuary to exhibitor was a substantial change. When the hearing resumed, the Board tabled the motion and requested testimony from appellants' as to their intended use for the property.

Layton testified at the November 15, 2001 hearing that, prior to acquiring the USDA license, the public was only allowed to inspect the animals for adoption between 1:00 p.m. and 5:00 p.m. on Sundays, and that was the original policy. The only exceptions to the policy were for fund-raising and "vet techs internships," and even those individuals would be asked to plan for Sunday afternoons. When asked about the "No Visitors" sign posted at the facility, she stated, "We call it a peaceable kingdom. One, we don't want to be bothered. It stresses the animals to have visitors. It stresses me to stop what I'm doing when what I'm doing is more important." She also testified that her reason for acquiring the permit was so that "Frisky's would be in compliance with Howard County's laws."

In addition to the conditions imposed by the Planning Board, to qualify for the USDA license, appellants stated that Frisky's was required to increase the height of the fences

around the animals from four feet to six feet high and move the fences back an additional foot from the animals, making the total distance three feet. They also replaced the wood floor in the primate room with ceramic tile for sanitation purposes. Appellant then testified concerning the visitor policy:

The visitor policy is, between September and March, the first and third Sunday of the month between one and five. No more than one car. No more than five people. Nobody under the age of sixteen. They have a reason for wanting to visit. They make an appointment and then we access [sic] it and they're allowed to come visit the animals by appointment only. Only between September and March.

The Board, on January 3, 2002, questioned appellant, principally concerning the visitor policy and the USDA license. The testimony of import was revealed through a colloquy with Robert Sharps and appellant, as follows:

THE BOARD: Let's talk about the permit that you have again. Under this USDA, is it a permit or a license?

Appellant: It is a license.

THE BOARD: It's a license.

[Appellant's Counsel]: Mr. Chairman can I introduce that into evidence at this particular time?

THE BOARD: If you would like to. I'm going to ask her a specific question about it and that may help. Well we have the license. It's not been entered except for on the bottom of the policy. And since it's on the, I can speak to that. Maybe later you may want to enter something if the question I ask is not answered. There's so much ambiguity on what this license permits you to do. What is in writing besides what we see on the front sheet of this one page that allows you to do as an exhibitor? Do you have something in writing other than your conversation with the . . .

Appellant: We have a manual that we have to follow and meet. Visitors such as somebody that is doing a tour, of course they can't handle, touch, hold, interact. They get

to see them from a distance like from where I am to the lawyers. And if a primate is not interested in even seeing them they go inside.

THE BOARD: Okay. Well the only reason that you are authorized to have this as we see so far, to even have primates there, is because you have this exhibitor's license, correct?

Appellant: I do have an impeccable reputation and I met everything that they asked me to do.

THE BOARD: No, no. I'm not questioning your reputation or your character. I'm saying the reason we're here now and continuing with this case is to allow you to present your case to have primates in that wildlife sanctuary is because you went and pursued and obtained a USDA license which says that it allows you to be an exhibitor, correct? And according to the regulations of the county Code if you don't have an exhibitor's license that's one of the exceptions for you to have primates.

Appellant: For me to become in compliance with Howard County's zoning laws and Howard County animal control laws they said that I had to get a USDA license because the County changed the laws on exotics as pets.

THE BOARD: We're going along in the right directions. I think you're agreeing with what I'm saying. Now that you have that, does that license say that you must have tours. As an exhibitor you can't exhibit without having someone see it. Correct?

Appellant: Exactly.

THE BOARD: And I think I want to go back to Mr. Waff's question. You seemed to evade with which I don't think is . . .

Appellant: I'm not meaning to.

THE BOARD: Well let me ask you a direct question and then maybe we can get an answer and that will just clear all this up. As an exhibitor you have to have people look at it. I don't care whether it's the public. You're calling it not the public. Well who is it? Private showings of

specific people on a list that you have that is specific only to membership?

Appellant: Pretty much, yes.

THE BOARD: What do you mean by pretty much, yes?

Appellant: Well we have college students that want to do an internship. Vet techs that do internships. We do mentor programs. We do, where people want to have a fund-raiser from their organization and of course they want to see what they're having the fund-raisers for. This is what we need to change here and we'd like to better this or this is the size of their enclosures, this the type of toys they need, this the size of cage, this the gage wire we use. Things of this such. If, you know, if somebody came there with a few children and said my children want to see the monkeys, of course we say no. We don't want them under any kind of stress. We don't want anybody bringing in any kind of germs. Nobody can get sick unless their introduced to it.

THE BOARD: Let me go back and maybe I'm not being clear either. The license that you received is an exhibitor license, correct?

Appellant: Yes.

THE BOARD: What does an exhibitor license allow you to do?

Appellant: It allows me to show when I want to show.

THE BOARD: Oh. It says that in there. You can discriminate on who gets to see this? It says that in the license?

Appellant: I don't think it is in writing, no.

THE BOARD: Well if it's not in writing would you assume that it may be open to the public as an exhibitor? Unless it says you can discriminate on who comes in there why would it not be allowed, why would they give you a license, a specific license that only allows your discrimination of who can come in and see the animals. Now when you can do it, I'm not even going to question. You're doing it twice a month. You can do it once a month as long as your exhibiting. Because obviously we don't have

anything that says that there is any specificity as far as time and dates. You can do that. But who allows you to discriminate who? The license allows you to do that?

Appellant: Yes.

THE BOARD: Where? Where does it specifically say, now I want to see the license, where it specifically allows you to discriminate ...

Appellant: I don't think that is in writing.

THE BOARD: Okay. So then we can't assume that. That's Mrs. Layton's feeling.

Appellant: No, that's the sanctuary's procedures that we had set up. It was submitted to USDA though.

THE BOARD: I understand. I'm not questioning that. It's approved. You have a license. I want to know what does that license allow you to do. Mr. Waff says for instance, and the reason I'm going through this and I'm not belaboring it, is you have a petition here that say specifically no tours will be given to the general public.

Appellant: That's exactly what it is, the general public. They're not allowed to come in.

THE BOARD: Who's the last person that you allowed to go in there to see those primates? Give me a name.

Appellant: My vet from the Falls Road Animal ...

THE BOARD: Okay, that's not the general public. Anybody outside of someone that you employ.

Appellant: There is nobody.

THE BOARD: Nobody has visited?

Appellant: We have our friends and family and neighbors that are around there but no, we haven't had a tour or visitor. Oh yes, we have had one of our lawyers.

\* \* \*

THE BOARD: ... Mrs. Layton let's cut to the chase, okay, so we can get through this. If someone wanted to come and see those animals under the license that you went and received from the USDA that allows you to be an exhibitor, can you discriminate and say no one other than who

you specifically anoint as a friend, family, vet or anyone else can see them and nobody else is allowed. Does that license allow you to do that?

Appellant: It allows me to do that but it is not in writing.

THE BOARD: I know that I'm not the smartest cookie in the this box but let me tell you something . . .

Appellant: I don't want to be classified as a zoo. I don't want the general public coming up there thinking they can come up there.

THE BOARD: We're not saying that. You're not a zoo. We're not even going there so let's stay with what you are. You're a wildlife sanctuary and the reason that you have primates there or that you're authorized to have those primates is that you went and obtained a license that allows you to do it as an exhibitor, correct?

Appellant: Yes.

THE BOARD: Now you must exhibit them.

Appellant: Yes.

THE BOARD: And that license says that you can exhibit it to anyone, it does not have to be the general public, just exhibit it to your private group. Your private, you have a membership, and only those private group of people in that membership can go. It says that?

Appellant: It doesn't say that.

THE BOARD: So can we assume that the general public can see those animals?

Appellant: If they make an appointment two weeks in advance and they're over sixteen.

THE BOARD: Thank you. Thank you. So the general public can see the animals. That's what Mr. Waff asked you.

Appellant: Okay. Yes they can. *But I'll say no.*

THE BOARD: But the general public is authorized to go and see those animals. If you deny them that's another question. We're not here for that.

Appellant: Okay.

**162**

THE BOARD: Now let's get back to the petition. In the petition you say that the general public will not be allowed. Okay now, so you have to amend your petition wouldn't you think?

Appellant: According to my attorneys, no. I'm wildlife management.

THE BOARD: We have agreed. Let's go back. We've agreed that unless that license says specifically that you can do it without the general public, we can assume that the general public is authorized to be part of that exhibit. Alright, can go and see those primates, correct?

Appellant: Correct.

THE BOARD: And we agree with that.

Appellant: Yes.

THE BOARD: Okay so the general public is authorized. So you're saying no general public will be authorized. Now is the time for you to amend your petition. That's what we're asking you what Mr. Waff asked. We can't see this, I'm going to tell you right now, if you go forward with this petition, which I'm going to ask the Office of Law whether or not we have to determine now whether or not this needs to be amended. And if it is amended we have to determine whether it is a substantive amendment.

\* \* \*

[Appellant's Counsel]: I'd like to address the issue if I can Mr. Chairman. The visiting policy, that I believe has been introduced . . .

\* \* \*

[Appellant's Counsel]: . . . is incorporated in the license. That is where the restriction goes. Now whether or not, it's not the general public. It's a restricted public. I don't think you can describe that as being open to the general public with those kinds of conditions. You can say it's, if you said well it's a conditional, restricted invitation to the public but whether or not the general public like a zoo or circus, people can just come in at will

and pay their money, that's open to the general public. This is separate. I don't think that they both are the same.

THE BOARD: You make a very good argument there [appellant's counsel]. Is that true Mrs. Layton. Is this only going to be to the restricted public?

Appellant: Yes.

THE BOARD: And not the general public?

Appellant: Exactly. The restricted word is probably the word I was searching for.

\* \* \*

THE BOARD: With that argument and with your statement I don't need to ask you whether or not it's considered a restricted public and not, if that's your testimony. Let's move on then. That could have been easily done if you had said that to Mr. Waff.

Upon request by counsel for Wyckoff, the Board voted that the request for approval for a special exception as an exhibitor did constitute a change to the petition, but that the change was not substantive. The Board heard testimony on the remaining dates from witnesses in support of Frisky's and in opposition, except that on June 6, 2002 and August 29, 2002, there was no further testimony. None of the witnesses testified to any matters of substance to this appeal.

Additional facts will be supplied as necessary to supplement the legal analysis.

## LEGAL ANALYSIS

Appellants first contend that this Court must remand the case to the Howard County Board of Appeals with instructions to apply the animal control law passed four months after the Board of Appeals rendered its decision in this case. The current animal control law became effective on September 27, 2004. Under Section 17.300.G, the law defines animal sanctuary:

(G) ANIMAL SANCTUARY. A FACILITY THAT PER-
FORMS AT LEAST ONE OF THE FOLLOWING FUNC-
TIONS:

(1) RESCUES, REHABILITATES, AND RELEASES,
WHEN POSSIBLE, NATIVE WILDLIFE; OR

(2) PROVIDES PERMANENT HOUSING TO THE FOL-
LOWING CATEGORIES OF NON–RELEASABLE
ANIMALS, AS DEFINED IN THIS SUBTITLE;

(I) WILD ANIMALS; OR

(II) EXOTIC ANIMALS.

Section 17.307.D prohibits individuals from possessing wild or
exotic animals unless they meet one of the defined exceptions.
Section 17.307.(D)(3) provides an exception for "The holder of
a valid permit issued by a state or federal authority to keep a
wild or exotic animal ... only to the extent provided in the
permit." Additionally, section 17.307.(D)(5) provides for an
exception to the general rule for sanctuaries, stating, "An
animal sanctuary is exempt from this subsection if the sanctu-
ary: meets all state and federal licensing and permitting
requirements."

Appellants' argument presents a pure legal question, which
this Court and the Court of Appeals have addressed on
numerous occasions, *i.e.*, whether a law should be applied
retrospectively. Appellants support their contention by argu-
ing that *Langston v. Riffe*, 359 Md. 396, 754 A.2d 389 (2000),
*Powell v. Calvert County*, 368 Md. 400, 795 A.2d 96 (2002) and
*Antwerpen v. Baltimore County*, 163 Md.App. 194, 877 A.2d
1166 (2005) have resuscitated the holding of the Court of
Appeals in *Yorkdale Corp. v. Powell*, 237 Md. 121, 205 A.2d
269 (1964) and carved out an exception to the general rule
announced by the Court in *WSSC v. Riverdale Heights Volun-
teer Fire Co.*, 308 Md. 556, 520 A.2d 1319 (1987). Appellees
counter that *WSSC* is not impaired by the trilogy of cases
cited by appellant and, in fact, is affirmed by the holdings of
*Allstate Insurance Co. v. Kim*, 376 Md. 276, 829 A.2d 611
(2003), *State Ethics Comm'n v. Evans*, 382 Md. 370, 855 A.2d
364 (2004), and *Della Ratta v. Larkin*, 382 Md. 553, 856 A.2d

643 (2004). They argue, therefore, that we should hold that the animal control law applies only prospectively.

We addressed the issues of prospective and retrospective application of a new or recently passed law most comprehensively in *Holland v. Woodhaven Building and Development, Inc.,* 113 Md.App. 274, 687 A.2d 699 (1996). We believe that the discussion in that decision is instructive in the disposition of the case at hand. Appellants, in *Holland,* aggrieved by a zoning decision, appealed to the Board of Zoning Appeals; the appeal being dismissed because they lacked standing to appeal. *Id.* at 277, 687 A.2d 699. Following their dismissal and before their case was heard in the circuit court, a new statute was passed which, if applied, would cure their lack of standing to appeal the zoning decision. *Id.* at 282, 687 A.2d 699. There, we discussed the applicable law:

> The rules governing retroactivity that we address in this case are rules of statutory construction. Such rules are easy to state, but difficult to apply. A number of Maryland cases can be cited for the general proposition that a statute is presumed to operate prospectively from its effective date absent a clear expression of legislative intent that the statute is to be applied retroactively.
>
> \* \* \*
>
> Despite the presumption of prospectivity, a number of other cases support the proposition that when a legislative change in law affects only procedural matters, rather than substantive rights, it applies to all actions, whether accrued, pending, or future, unless a contrary intention is expressed.
>
> \* \* \*
>
> As a preliminary matter, the question of what is procedural and what is substantive often is a difficult one to determine. *See, e.g., Mason,* 309 Md. at 221–22, 522 A.2d 1344 (where amendment to Post Conviction Procedure Act, limiting number of petitions that could be filed under Act, was held to affect petitioner's substantive rights). While standing could be characterized as a procedural question only, ... it also could be characterized as a substantive

matter, inasmuch as it involves the ability to pursue a right of action.

To complicate matters, appellants cite another line of cases that hold that "an appellate court must apply the law in effect at the time a case is decided, provided that its application does not affect intervening vested rights."

\* \* \*

A countervailing principle to that statement is that, absent legislative intent to the contrary, a change in procedural law will not be applied retroactively to undo proceedings that already have concluded prior to the passage of the law.

\* \* \*

The first two principles we have identified favor the prospective application of legislative changes to law affecting substantive rights and the retroactive application of changes affecting only remedy or procedure. The latter two principles favor the contrary result.

All four of these principles were alive and well when we decided the case of *T & R Joint Venture v. Office of Planning & Zoning of Anne Arundel County*, 47 Md.App. 395, 424 A.2d 384 (1980). Interestingly, that case involved facts, to the extent material, identical to those in the instant case. In that case, a developer's application for rezoning was granted by the Zoning Hearing Officer for Anne Arundel County. *Id.* at 398, 424 A.2d 384. The Anne Arundel County Office of Planning and Zoning (OPZ) attempted to appeal the Zoning Hearing Officer's decision to the Board of Appeals. *Id.* at 396, 424 A.2d 384. Applying the law then in effect, the Board of Appeals dismissed OPZ's appeal because it found that OPZ was not a person aggrieved within the meaning of the statute governing appeals to the Board. *Id.* While the appeal was pending in the circuit court, the County amended its statute expressly to confer standing upon the planning and zoning officer, "notwithstanding his lack of a personal or property right adversely affected by the decision of the zoning hearing officer." *Id.* at 403–04, 424 A.2d 384. The circuit court applied the

amended statute to confer standing upon OPZ, and we affirmed.

In that case, we noted that

[t]here have been literally dozens of cases in which the Court has been faced with a question of whether to apply an intervening change in the law to a pending case. Some of the decisions are not easy to reconcile, and thus the diligent lawyer or judge can easily find some authority for both sides of the proposition. *Id.* at 405 n. 5, 687 A.2d 699, 47 Md.App. 395, 424 A.2d 384.

Further, observing that much of the discussion regarding procedure versus substance "is semantics," we declined to engage in such an analysis, and, instead, applied the doctrine that " 'a court is to apply the law in effect at the time it renders its decision unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary.' " *Id.* at 407, 687 A.2d 699, 47 Md.App. 395, 424 A.2d 384 (quoting *Bradley v. School Board of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974)). We reasoned that this principle made "eminently good sense" and was applied by the Court of Appeals in *Janda v. General Motors Corp.*, 237 Md. 161, 205 A.2d 228 (1964) and its predecessors.

Were the principle espoused in *T & R Joint Venture* still good law, we would apply it to this case, and then be faced with the question of whether Ordinance 268 is preempted by State law.FN6 Seven years later, however, the Court of Appeals rejected the principle that we applied in *T & R Joint Venture* and that the Court of Appeals had applied in *Janda*. *Riverdale Fire Co.*, 308 Md. at 565–68, 520 A.2d 1319. Instead, it reaffirmed the converse principle "that under the law of Maryland statutes ordinarily are construed to operate prospectively, absent a clear legislative intent to the contrary." *Id.* at 568, 520 A.2d 1319. Given the holding in *Riverdale Fire Co.*, the principle applied in *T & R Joint Venture* is no longer good law.

Perhaps recognizing that part of the discussion in *Janda* and some of the cases cited therein are no longer the law of Maryland, appellants rely on *O'Donnell v. Bassler*, 289 Md. 501, 425 A.2d 1003 (1981). Without discussing *Janda* or *Riverdale Fire Co.*, appellants assert that "[i]n *zoning* cases, Maryland law is absolutely clear [that 'a]n appellate court must apply the law in effect at the time a case is decided, provided that its application does not affect intervening vested rights.'" We see no reason to distinguish zoning cases in this manner. The Court of Appeals could have limited its holding in *Riverdale Fire Co.* to exclude zoning cases, but it did not so limit that case. *See, e.g., Arundel Corp.*, 323 Md. at 509–10, 594 A.2d 95 (applying *Riverdale Fire Co.* in a zoning case).

We caution, however, that, while zoning cases are not exempt from the principles of construction set forth in *Riverdale Fire Co.*, changes in zoning laws, such as zoning reclassifications, ordinarily will apply retrospectively *by their very terms*. Such *in rem* changes to the status of property necessarily will raise the question of whether the changes interfere with the property owner's vested rights.... Indeed, *O'Donnell* involved just such a case.

Apparently, the Court of Appeals did not, as we attempted to do, discard the procedure versus substance distinction. *Riverdale Fire Co.* involved a matter of substantive law, and subsequently decided cases have included considerations of whether the statute affects merely procedure versus substance. *See, e.g., Mason, supra. But see Arundel Corp. v. County Comm'rs*, 323 Md. 504, 509–10, 594 A.2d 95 (1991) (construing amendments to zoning ordinance which changed the filing requirements for conditional use applications to operate only prospectively). Accordingly, the principles that seem to survive *Riverdale Fire Co.* are that, absent clear legislative intent to the contrary, (1) a statute ordinarily will be presumed to operate prospectively; (2) a statute that changes procedure only ordinarily will be applied to pending cases; and (3) new procedural law, although appli-

cable to pending cases, will not ordinarily be applied to undo procedures that already have concluded.

*Id.* at 283–87, 687 A.2d 699 (footnotes omitted) (citations omitted).

In *Holland,* we applied the general rule of *Riverdale Fire Co.,* as the Ordinance in question did not state whether it was to be applied retroactively. *Id.* at 287–88, 687 A.2d 699.

The principal case relied upon by appellant was not a zoning or land use case, but rather involved a determination as to whether a change in a statute allowing men, who, either by blood or genetic testing determined they are not the putative father of a child, to petition the court to modify or set aside the paternity declaration. *Langston v. Riffe,* 359 Md. at 403, 754 A.2d 389. The Court held that the changes applied retrospectively to paternity declarations entered prior to the statute's effective date. *Id.* at 406, 754 A.2d 389.

In reaching its decision, the Court stated the general rule: The question whether a statute operates retrospectively, or prospectively only, ordinarily is one of legislative intent. In determining such intent this Court has repeatedly stated, "[t]here is a general presumption in the law that an enactment is intended to have purely prospective effect. In the absence of clear legislative intent to the contrary, a statute is not given retrospective effect."

*Id.* (citing *Traore v. State,* 290 Md. 585, 593, 431 A.2d 96 (1981)). The Court, however, recognized that there were exceptions allowing retrospective application, noting: 1) where the legislative enactment applies only to a procedural change; or 2) when the legislation is intended to have only a remedial effect and does not impair vested rights. *Id.* at 407–08, 754 A.2d 389. The Court found that the statute in question was both procedural and remedial. *Id.* at 407–410, 754 A.2d 389. Additionally, the Court determined that the bill file contained evidence that the legislature intended the statute to be applied retroactively. *Id.* at 413, 754 A.2d 389. The Court also concluded that the Act would not interfere with any substantive rights. *Id.* at 420, 754 A.2d 389. In that regard, the

Court stated: "As to substantive rights, the legislation does not grant or create any new right to putative fathers to challenge paternity declarations against them. Rather, the Act provides new methods or procedures a putative father can use to require a court to set aside an erroneous paternity declaration." *Id.* In sum, the decision concluded that the statute conformed to each of the exceptions to the general rule.

Appellant also relies on *Powell v. Calvert County,* 368 Md. 400, 795 A.2d 96 (2002). The Court of Appeals granted *certiorari* in that case to consider if the appellant had a vested right to use his property for outdoor storage of construction materials. *Id.* at 402–03, 795 A.2d 96. Powell applied for a special exception, which was granted, to store construction equipment on his fourteen acre parcel. *Id.* at 404, 795 A.2d 96. Subsequently, Powell began to store construction materials on the property and, following litigation, was informed that he would need a special exception for the materials. *Id.* He applied for the special exception and it was also granted; however, it was challenged in the circuit court and then in this Court. *Id.* While the appeal was pending, the County amended the zoning ordinance and removed the provision under which Powell was granted his exception. *Id.* at 405, 795 A.2d 96. We vacated the Board's decision and remanded the case for further proceedings before the Board. *Id.*

The Board, without considering Powell's request for the special exception under the revised law, granted the special exception, which was again challenged in the circuit court. *Id.* at 406, 795 A.2d 96. The circuit court determined that the revised law should have prevented the grant of the special exception, but Powell was protected from the changed law because he had obtained a vested right. *Id.* On appeal to this Court, for the second time, we concluded that, based upon *Holland, supra,* the intervening ordinance, which would not permit the storage of construction materials on appellant's property, should have been applied absent a vested right. *Id.* at 408, 795 A.2d 96. We also found that Powell had a vested right by reason of the fact that we did not declare the special

exception unlawful or invalid "within the meaning of the rule of vested rights," when the order was vacated following the first appeal. *Id.* at 409, 795 A.2d 96.

The decision of the Court of Appeals did not devolve upon whether the intervening zoning ordinance should apply retrospectively, but only considered that issue from the standpoint that the ordinance was in effect at the time when the case was remanded to the Board. *Id.* at 415, 795 A.2d 96. The Court's decision was based upon the principle that, until the case was finally decided, no rights could vest in Powell. *Id.* at 416, 795 A.2d 96. In that regard, *Powell* lends no support to appellant's argument that the animal control law should apply retrospectively because the petition for the variance was new by reason of our Mandate from the first appeal.

Finally, appellant cites *Antwerpen v. Baltimore County*, 163 Md.App. 194, 877 A.2d 1166 (2005). The decision in *Antwerpen* was also based upon the determination of whether appellant had obtained a vested right, in that instance, to operate a used car lot. *Id.* at 205, 877 A.2d 1166. Antwerpen had applied for a special hearing to determine if it was permissible for it to operate a used car lot in a Business Major (B.M.) zoned area in Baltimore County. *Id.* at 195–96, 877 A.2d 1166. Prior to the hearing, the County Council passed a bill to clarify that new car dealerships were permitted in B.M. zoned areas and that used car dealerships are only permitted with a special exception as part of a commercial planned unit development. *Id.* at 197, 877 A.2d 1166. At the hearing, the Commissioner granted Antwerpen permission to have the used car dealership in a B.M. zoned area and that decision was challenged. *Id.* at 198–99, 877 A.2d 1166. While the Commissioner's decision was being challenged, the dealership began operations. *Id.* at 200, 877 A.2d 1166. Appellant claimed that it had a vested right at the time the statute became effective. *Id.*

We concluded that *Powell, supra,* was controlling, insofar as Antwerpen's rights could not vest during the time when the case was pending on appeal. *Id.* at 210, 877 A.2d 1166.

Although we did rely on the holding in *Mandel v. Board of County Comm'rs of Howard County*, 238 Md. 208, 215, 208 A.2d 710 (1965), for the proposition that the Board in *Antwerpen* was required to apply the law in effect on the date it heard the case, that was clearly not the basis of our decision. *Id.* We did not engage in any analysis of the doctrine of prospective versus retrospective application of the law, which is the issue presented in the present case. Moreover, what we stated from *Mandel* is no different than the statement made in *Holland, supra,* concerning the retrospective application of the changes in zoning laws.

■ Turning to the instant case, we see no reason to stray from the general rule that statutes are presumed to operate prospectively and are construed accordingly. *See Washington Suburban Sanitary Commission v. Riverdale Heights Volunteer Fire Co. Inc.*, 308 Md. 556, 560–61, 520 A.2d 1319 (1987). We are unable to discern in the statute a clear expression of the legislative intent that the statute should operate retrospectively, nor have appellants directed us to any such intent in their brief or in oral argument. Notwithstanding that there is no articulated legislative intent, no other exception to the general rule applies to the change in the animal control law.

The law is not procedural, but substantive. The Court of Appeals discussed the difference between substantive laws and procedural or remedial laws in *Langston,* stating: "A law is substantive if it creates rights, duties, and obligations, while a remedial or procedural law simply prescribes the methods of enforcement of those rights." 359 Md. at 419, 754 A.2d 389 (citations omitted). The animal control law at issue provides a right for a sanctuary to have exotic and wild animals, not a new method or procedure to enforce their right to have the animals. We discussed in *Langston* what defines a remedial statute, stating:

Generally, remedial statutes are those which provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries. They also include statutes intended for the correction of

defects, mistakes and omissions in the civil institutions and the administration of the state.

359 Md. at 408–09, 754 A.2d 389. The animal control law is not remedial, but a new substantive right to possess wild and exotic animals for facilities that are designated as animal sanctuaries.

Finally, the animal control law is not a zoning law; whether it should be applied retrospectively is not properly based upon the rationale relied upon in our decisions in *Mandel* and *Holland.* Thus, we hold that the circuit court did not err by refusing to remand the case to the Board for consideration under the current animal control law.

Appellant's next claim that the Board's decision should be reversed because (a) the Board defiled the process by deviating from "a position decided at its hearing; (b) the Board disregarded the Federal License obtained by appellants during the lengthy process as well as a County Solicitor's letter of advice to the Police Chief on the effect of said license;" and (c) "the Board's conclusion that Appellant's [sic] 'failed to provide sufficient evidence' is asserted without any reference to what was not proven in derogation of actual testimony." Appellees assert that the Board's decision was based upon the law and there was substantial evidence to support their decision.

## STANDARD OF REVIEW

■ We review the decisions of a zoning board under two general standards. *Hayfields, Inc. v. Valleys Planning Council, Inc.,* 122 Md.App. 616, 629, 716 A.2d 311 (1998) (citations omitted). There, we said:

> In regards to findings of fact, the trial court cannot substitute its judgment for that of the agency and must accept the agency's conclusions if they are based on substantial evidence and if reasoning minds could reach the same conclusion based on the record; when reviewing findings of law,

however, no such deference is given the agency's conclusions.

*Id.*

 Substantial evidence has been defined as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Snowden v. City of Baltimore,* 224 Md. 443, 448, 168 A.2d 390 (1961) (citations omitted). The evidence is to be viewed in the light most favorable to the Board because " 'decisions of administrative agencies are prima facie correct,' and 'carry with them the presumption of validity.' " *Bulluck v. Pelham Wood Apartments,* 283 Md. 505, 513, 390 A.2d 1119 (1978). Additionally, we must not substitute our judgment for the expertise of the Board from which the appeal is taken. *Id.* "[I]f the issue before the administrative body is 'fairly debatable' that is, that its determination involved testimony from which a reasonable man could come to different conclusions, the courts will not substitute their judgment for that of the administrative body...." *Eger v. Stone,* 253 Md. 533, 542, 253 A.2d 372 (1969). The resolution of conflicts in the evidence is left to the agency and, where inconsistent inferences may be drawn, the agency is left to draw the inference. *Bulluck,* 283 Md. at 513, 390 A.2d 1119 citing *National Labor Relations Board v. Nevada Consol. Copper Corp.,* 316 U.S. 105, 106–07, 62 S.Ct. 960, 86 L.Ed. 1305 (1942). The test for reviewing the inferences drawn by the agency is reasonableness, not rightness. *Snowden,* 224 Md. at 448, 168 A.2d 390 (citations omitted.)

Finally, we have held:

Also, unlike our review of a trial court's judgment, we will only uphold the decision of an agency on the basis of the agency's reasons and findings.... We may search the record for evidence to support a trial court's judgment; and we may sustain that judgment for a reason plainly appearing on the record, even if the reason was not relied on by the trial court. But we may not uphold an agency's decision unless it is sustainable on the agency's findings and for the reasons stated by the agency.

*Umerley v. People's Counsel for Baltimore County,* 108 Md. App. 497, 504, 672 A.2d 173 (1996) (quotation marks omitted).

## A. THE BOARD'S ALLEGED DEVIATION AND PRO-CESS VIOLATION

Appellant argues, in reliance on *Temmink v. Board of Zoning Appeals of Baltimore Co.,* 205 Md. 489, 109 A.2d 85 (1954), *Rogers v. Radio Shack,* 271 Md. 126, 314 A.2d 113 (1974) and *Dembeck v. Bethlehem Shipbuilding Corp.,* 166 Md. 21, 170 A. 158 (1934), that the Board erred by finding that appellant's application was reviewed for the purpose initially asserted—a wildlife refuge and primate sanctuary—rather than the use for which appellant was asserting at that time, an animal exhibitor. This, they contend, was unfair and constituted a procedural due process violation.

In *Dembeck,* the Court reviewed the decision from the Circuit Court for Baltimore City, affirming an order of a workman's compensation board discontinuing the payments of the claimant. 170 A. at 158. The claimant submitted to an examination by the Commission's doctor, who submitted his report to the Commission, but the report was not produced at the hearings, and claimant had no opportunity to cross-examine the doctor concerning the report. *Id.* at 160. The Court determined that it violated the claimant's fundamental rights to confront witnesses against him and test the correctness and truthfulness of the evidence against him. *Id.* The rule adopted by the Court in deciding the issue was stated as:

A perhaps broad statement of the rule which must be now adopted is that the commission makes the record upon which the case must be tried on appeal, but that it must make a proper record; and the function of the trial court is to inspect the record made by the commission, and, upon discovery of a fundamental error, or error which would result in a substantial denial of justice to any of the parties concerned, by its order to return the record to the commission, to the end that a proper record be made by the

commission and sent to the court for use in the trial on appeal.

*Id.*

*Temmink,* cited by appellants, also involved a zoning board, which requested a report from the Baltimore County Planning Commission, which it then relied upon in rendering its decision. 205 Md. at 496, 109 A.2d 85. The report was not admitted into evidence. *Id.* at 497, 109 A.2d 85. The case was remanded for further proceedings in order that the report could be entered and the parties would have an opportunity to present evidence and conduct cross-examination. *Id.*

*Dembeck* and *Temmink* were cited by the Court in *Rogers.* The issue presented there was whether an investigation report of Rogers' discharge, ordered by the agency and submitted to the court as part of the record, should be stricken. *Rogers,* 271 Md. at 128–29, 314 A.2d 113. The Court once again concluded that, without an opportunity for cross-examination or rebuttal, fundamental fairness would preclude any reliance upon the report. *Id.* at 129, 314 A.2d 113. In *Rogers,* however, because the Court concluded that neither the Board nor the circuit court relied upon the report, the fact that it was not stricken from the record, even if error, was harmless. *Id.*

What we extract from the cases cited by appellant is that reversal is required where the actions of an administrative agency have denied the parties a fundamental procedural right. We are not persuaded that appellants suffered from an error, if any, so fundamental that it resulted in injustice. The Board's findings in this regard are not challenged as being erroneous. Significantly, appellants, from the first hearing, declared that acquisition of the license did not require that their application be re-submitted to Planning and Zoning for review under the newly created circumstances, *i.e.,* that of being an animal exhibitor. In any event, if this finding constituted error, it must be viewed as harmless. Based upon our review of the Board's decision, it is clear that it did not rely on that finding in reaching its conclusion, but rather on the fact that appellants did not present sufficient evidence, in

its judgment, to convince the Board that they qualified as an animal exhibitor.

## B. THE BOARD'S DISREGARD OF THE FEDERAL LICENSE AND THE REFUSAL TO ACCREDIT THE OPINION OF THE COUNTY SOLICITOR

 Appellants allege that the Board ignored the USDA license, which permitted them to exhibit the primates and keep the primates on the property under the exemption granted to individuals that have a federal license. Appellants also allege that the Board ignored the letter from the County Solicitor to the Chief of Police indicating that, while appellants possessed the federal license, they were not in violation of the animal control law. Appellees argue that the fact that the Board was not persuaded by the County Solicitor's letter did not constitute error. Appellees also posit that the burden was on appellants to prove to the Board that they functioned as exhibitors and that, in that regard, they failed.

With respect to the letter from the County Solicitor to the Police Chief, appellants have directed us to a number of opinions of the Court of Appeals and this Court, which demonstrate that there has been reliance on the legal advice of counsel. *See Board of Child Care of the Baltimore Annual Conference of the Methodist Church, Inc. v. Harker*, 316 Md. 683, 686, 561 A.2d 219 (1989)(discussing the Zoning Commissioner's reliance on the County Attorney's pronouncement of the governing law); *Levinson v. Montgomery County*, 95 Md.App. 307, 336, 620 A.2d 961 (1993) (referring to the County Attorney's opinion on the permitted use of property under a zoning ordinance); *Mayor and City Council of Baltimore v. Crane*, 277 Md. 198, 210–11, 352 A.2d 786 (1976) (explaining that the opinion of the County Solicitor is not binding on the municipality, but is entitled to some weight); *see also Logan v. Town of Somerset*, 271 Md. 42, 50–51, 314 A.2d 436 (1974)(discussing the fact that the County Attorney issued contradictory opinions on an issue, upon which reliance was placed in constructing a swimming pool); *Prince George's County v. Maryland–National Capital Park and Planning Commis-*

*sion,* 269 Md. 202, 219, 306 A.2d 223 (1973) (discussing the County Council's reliance on the advice of the County Attorney). That being said, it is clear that, while the Board could have considered the letter, it was not binding on the Board as to its determination of whether appellant was actually operating as an exhibitor. The Board's determination was not merely based on whether appellants had obtained the license, which did form the basis of the County Solicitor's letter, but rather on how appellants were actually operating under the license. We agree with the trial court's conclusion that the letter was only advisory upon the Board, and appellants have directed us to no authority to the contrary.

In response to appellants' claim that the Board ignored the license, we disagree with that contention. In its findings, the Board clearly acknowledges that appellants have an exhibitor's permit granted by the USDA. They state, "At the hearing held before the Board on November 1, 2001, the Petitioner submitted documentation that Frisky's had obtained a 'Class C Exhibitor' license pursuant to the Animal Welfare Act (7 U.S.C. § 2131 et seq.) from the United State Department of Agriculture." Appellants' claim, however, relates to the Board's determination that appellants were not actually an exhibitor. Appellants seem to suggest that, by stating that the Board ignored the license, the Board did not conclude as it would have, that the acquisition of the license is only open to the interpretation that they are an exhibitor, without regard to how they operate. It is their position that, in the absence of any definition of what is sufficient to be deemed an exhibitor, the Board should have accepted the definition given by USDA and the County Solicitor. Moreover, they state that, because the term was undefined, the Board could not simply determine its definition.

The issue of whether appellants actually functioned as an exhibitor, as well as any meaning which could be gleaned from the granting of the license by USDA, was given extensive consideration over multiple days of testimony. The Board's finding was that appellants did not present sufficient evidence to support a finding that they were displaying or exhibiting

animals to the public. We highlighted, *supra*, the testimony of Ms. Layton, indicating that she intended to keep the display of the animals restricted and that the general public would not be permitted to view the animals under her policy. It is clear from the record, contrary to appellants' assertion, that the Board was concerned with public display.

## C. THE SUFFICIENCY OF THE EVIDENCE UPON WHICH THE BOARD'S CONCLUSION WAS BASED

Appellants' final argument is that the Board failed to make specific findings to support its conclusion of insufficient evidence, apparently, of whether Frisky's operated as an exhibitor. We quote appellants' final argument as set forth in their brief.

Not only did the Board pay little heed to the Federal License held by Appellants as required by law and ignore the County Solicitor's letter of advice, the Board's ipse dixit statement of insufficient evidence merely scoffed at Appellants' visitor's policy [ ] while giving no credence to testimony of witnesses [ ], Appellant Layton [ ] and self-styled expert [ ] and admissions of Protestant of a field trip by student visitors[ ].

The Board's rhetoric did not make the "specific finding" demanded by *Lewis v. DNR*, 377 Md. 382, 435, 833 A.2d 563 (2003). The Board's conclusion was inadequate under *Ocean Highway Condo Assn. v. Broadwalk* [sic] *Plaza*, 68 Md.App. 650, 660–63, 515 A.2d 485 (1986). Under *Eller Media Co. v. M & CC*, 141 Md.App. 76, 87–8, 784 A.2d 614 (2001), Appellant's [sic] should not have to guess at what more evidence the Board wanted. *See also Eastern Outdoor v. M & CC*, 146 Md.App. 283, 324, 807 A.2d 49 (2002): zoning petitioners have a fundamental right to be appraised of facts relied on by the agency. *Compare, Hikmat v. Howard County*, 148 Md.App. 502, 531, 813 A.2d 306 (2002). Below, Appellants could only guess at what the Board wanted as evidence.

The absence of sufficient findings by the Board compels reversal and remand for further consideration by the Board.

In *Lewis*, 377 Md. at 394–95, 833 A.2d 563, the Court considered a zoning board's denial of a variance requested by a petitioner in an area covered by the Chesapeake Bay Critical Area Protection Program. The petitioner argued that the Board was required to make a specific finding with respect to each of the criteria within the code to determine if a hardship existed, permitting his variance, and the Court agreed. *Id.* at 433, 833 A.2d 563. The Court, in reliance upon *White v. North*, 356 Md. 31, 736 A.2d 1072 (1999), concluded that the Board had applied the incorrect standards of law in deciding that petitioner did not meet the criteria to establish a hardship. *Id.* at 436, 833 A.2d 563.

In *Ocean Hideaway Condominium Association*, 68 Md. App. at 655, 515 A.2d 485, the decision devolved upon the fact that the Board was required, in considering a variance under the code, to consider each of the nine criteria and make findings of fact with respect to each. We concluded that statements made by the Board were "nothing more than a positive statement of each of the conditions precedent to the approval by the Board of the special exception." *Id.* at 659, 515 A.2d 485.

Appellants have cited *Eller*, 141 Md.App. at 88, 784 A.2d 614, where we held that the zoning board failed to support its conclusions with factual findings. There, we stated:

The Court of Appeals stated in *Bucktail, LLC v. County Council*, 352 Md. 530, 553, 723 A.2d 440 (1999):

[I]n order for the reviewing court to determine whether the [agency's] action was fairly debatable, findings of fact are required.

Findings of fact must be meaningful and cannot simply repeat statutory criteria, broad conclusory statements, or boilerplate resolutions.

(Citation omitted.) Without such findings, a reviewing court's clumsy alternative is to *read* the record, *speculate* upon the portions which probably were believed by the board, *guess* at the conclusions drawn from credited portions, construct a *basis* for decision, and try to *determine*

whether a decision thus arrived at should be sustained. In the process, the court is required to do much that is assigned to the board, guess at the conclusions drawn from credited portions, construct a basis for decision, and try to determine whether a decision thus arrived at should be sustained.

*Ocean Hideaway Condo. Ass'n v. Boardwalk Plaza Venture*, 68 Md.App. 650, 662, 515 A.2d 485 (1986) (quoting *Gough v. Board of Zoning Appeals*, 21 Md.App. 697, 702, 321 A.2d 315 (1974)).

*Id.* at 87–88, 784 A.2d 614.

 *Eastern Outdoor* and *Hikmat* are also cited by appellants for the same pronouncements of the law provided, *supra*. We disagree with appellants' contention that the Board did not make specific findings to support its conclusion. Appellants identified three pieces of evidence, recited *supra*, in support of this contention. As stated, we previously described the testimony from Layton concerning her intent to operate the facility on a restricted basis. The conflicting evidence makes the Board's decision, that Frisky's is a rehabilitation and sanctuary for animals and not for displaying animals to the public, "fairly debatable." We are not to substitute our judgment for that of the Board. The inference reached by the Board that "The animals at the Center are not kept there for the purpose of public exhibition" is reasonable.

For the foregoing reasons, we affirm the decision of the Circuit Court for Howard County.

**JUDGMENTS OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**